**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ronald N. WEAVER, Defendant–
Appellant.**

No. 93–1427.

United States Court of Appeals,
Seventh Circuit.

Argued Aug. 3, 1993.

Decided Nov. 5, 1993.

Rehearing and Suggestion for Rehearing
En Banc Denied Dec. 9, 1993.

Colin S. Bruce, Asst. U.S. Atty., Office of the U.S. Atty., Springfield, IL (argued), for plaintiff-appellee.

Timothy E. Duggan, Springfield, IL (argued), for defendant-appellant.

Before POSNER, Chief Judge, and BAUER and MANION, Circuit Judges.

BAUER, Circuit Judge.

Pursuant to a conditional plea agreement, Ronald N. Weaver pleaded guilty to possession of a firearm by a felon in violation of 18 U.S.C. § 922(g), preserving his right to challenge the district court's denial of his motion to quash arrest and suppress evidence. Fed. R.Crim.P. 11(a)(2). Weaver now appeals the denial of that motion. Weaver also contends that the district court erred in increasing his base offense level under U.S.S.G. § 3A1.2(b), which provides for a three-level increase for creating a substantial risk of serious bodily injury to a law enforcement officer. We affirm.

## I. BACKGROUND

On April 19, 1992, Officer John Bolinger of the Springfield, Illinois police department, Investigator Pitchford of the State Appellate Prosecutor's Office, and several other police officers were executing a state search warrant for illegal drugs in a private residence located at 100 North State Street in Springfield, Illinois. At about 12:30 a.m. the telephone rang, and Officer Bolinger answered it. A person who identified himself as "Ron" asked whether Bolinger had his "stuff." Bolinger replied that he did, and Ron asked why he had not delivered it. When Bolinger explained that he had been tied up, Ron asked whether he could come over and get it. Ron also asked whether Bolinger had his "tool." Bolinger said that he did, and told Ron to come over. Ron asked in a suspicious tone whether "everything was cool," and Bolinger assured him that it was. The conversation then ended. In anticipation of the visit, marked police cars were removed from the immediate vicinity of the house. Approximately five to ten minutes later, the phone rang again. This time, Investigator Pitchford answered it. After Pitchford got off the phone, he told Bolinger that he had just spoken with a person who identified himself as Ron and asked for directions to the house.

Approximately five to ten minutes after the second telephone call, there was a knock

at the front door. Pitchford told the person at the door to come in. The front door opened and the person, later identified at the suppression hearing as Weaver, started to come in. He then stated, "No, I'm not coming in. I think I'm going to leave," and began to move rapidly away from the front door. Pitchford, who was in plainclothes, went out the door after Weaver, stating that he was a police officer and that he wanted to talk to Weaver. Bolinger, also in plainclothes, joined the pursuit. Weaver appeared to be headed in the direction of a car parked nearby when Pitchford grabbed him by the jacket and said, "I want to talk to you." Weaver broke free and began to run. Both Bolinger and Pitchford were yelling "Police!" as they pursued him. Bolinger caught up with Weaver and tackled him in the front yard. In an effort to get away, Weaver kicked Bolinger in the chest, knocking him backwards. At that point, Bolinger decided that he was going to place Weaver under arrest for aggravated battery to a police officer. Bolinger, Pitchford and two other officers struggled with Weaver and managed to subdue him. During the struggle, Weaver yelled, "Kill me, I don't want to go back to prison," and repeatedly reached inside his jacket with his right hand. After Weaver was handcuffed, one of the officers retrieved a fully loaded Smith and Wesson .44 Magnum revolver from the inside of Weaver's jacket.

On the basis of this seizure, Weaver was charged in a one-count indictment with unlawful possession of a firearm by a felon. Weaver moved the district court to quash the arrest and suppress the revolver on the grounds that police initially had no reasonable suspicion to stop him, and that his subsequent arrest was not supported by probable cause. A hearing was held, at which Weaver testified that when he arrived at 100 North State Street, he realized that he had come to the wrong house and immediately turned to leave. As he was leaving, Pitchford allegedly drew a gun and pointed it at him. Weaver claimed that he did not struggle when the officers tackled him, and that he was never informed by any of them that they were police officers. The district court discredited Weaver's account of the incident,

determining that Weaver's initial encounter with Pitchford and Bolinger began as an investigatory stop supported by reasonable suspicion, and that once Weaver had kicked Bolinger, police had probable cause to place him under arrest. The subsequent search of his jacket, which yielded the revolver, was thus justified as incident to a lawful arrest. The district court accordingly denied the motion to suppress.

A presentence report was prepared, and Weaver filed numerous written objections, which the district court rejected. The court found by a preponderance of the evidence that a three-level increase in Weaver's base offense level was warranted under U.S.S.G. § 3A1.2(b) for assaulting an officer in a manner creating a substantial risk of serious bodily injury. Weaver's total offense level was thus set at 25, with a criminal history category of III, resulting in a range of 70 to 87 months imprisonment and two to three years of supervised release. The court accepted the government's recommendation that Weaver be sentenced at the low end of the applicable guideline range, sentencing him to 70 months in prison, followed by three years of supervised release.

## II. ANALYSIS

### A. *The motion to quash arrest and suppress evidence.*

██ The district court determined that Weaver's initial encounter with Pitchford and Bolinger was a lawful investigatory stop, and that the force used to detain Weaver was reasonable in view of Weaver's efforts to resist the officers' request to talk to him. The court also determined that Weaver was properly placed under custodial arrest after he kicked Bolinger. Two types of Fourth Amendment "seizure" are thus at issue: an investigatory stop, for which an officer must have specific, articulable facts that give rise to a reasonable suspicion that the person stopped has committed or is about to commit a crime, *see United States v. Hensley,* 469 U.S. 221, 227, 229, 105 S.Ct. 675, 679, 680, 83 L.Ed.2d 604 (1985); *Terry v. Ohio,* 392 U.S. 1, 30–31, 88 S.Ct. 1868, 1884–85, 20 L.Ed.2d 889 (1968); *United States v. Johnson,* 910

F.2d 1506, 1508 (7th Cir.1990), *cert. denied,* 498 U.S. 1051, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991), and an arrest, which must be supported by probable cause, *see Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964); *Johnson,* 910 F.2d at 1508.

■ The parties dispute when the investigatory stop of Weaver became an arrest. There is no bright-line test which separates a lawful investigatory stop from an illegal arrest; when police officers are faced with what is essentially a fluid situation, they are permitted to graduate their responses to the demands of the particular circumstances confronting them. *See Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 1871–72, 104 L.Ed.2d 443 (1989); *United States v. Sharpe,* 470 U.S. 675, 685–86, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985); *United States v. Glenna,* 878 F.2d 967, 971 (7th Cir.1989); *United States v. Serna–Barreto,* 842 F.2d 965, 966–68 (7th Cir.1988); *see also United States v. Lechuga,* 925 F.2d 1035, 1039–41 (7th Cir. 1991); *United States v. Chaidez,* 919 F.2d 1193, 1197–99 (7th Cir.1990), *cert. denied,* —— U.S. ——, 112 S.Ct. 209, 116 L.Ed.2d 167 (1991). The crux of our inquiry in each case is whether police conduct meets the Fourth Amendment's standard of objective reasonableness. *See Sharpe,* 470 U.S. at 682–83, 105 S.Ct. at 1573; *see also Graham,* 490 U.S. at 397, 109 S.Ct. at 1872; *Terry,* 392 U.S. at 19–21, 88 S.Ct. at 1878–79. In determining whether the degree of intrusiveness of an investigatory stop was objectively reasonable, we consider whether the suspect's own actions in resisting the legitimate efforts of police to stop and question him played a role in bringing about the challenged police conduct. *See Graham,* 490 U.S. at 396, 109 S.Ct. at 1871; *Tom v. Voida,* 963 F.2d 952, 958–59 & n. 6 (7th Cir.1992) (citation omitted).

■ We begin our analysis by evaluating the reasonableness of the officers' initial stop of Weaver. *See Sharpe,* 470 U.S. at 682, 105 S.Ct. at 1573; *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879. While executing the search warrant, Officer Bolinger and Investigator Pitchford received two telephone calls from a person who identified himself as "Ron," and stated that he would come over to pick up his "stuff." Based on his extensive experience in narcotics investigation, Bolinger recognized this term as referring to illegal drugs. Bolinger also noticed that "Ron" sounded suspicious, and asked whether everything was "cool," thus adding to Bolinger's impression that the person on the other end of the line might have some illegal activity in mind. When Weaver arrived at the door ten minutes later, Pitchford and Bolinger had specific, articulable reasons why they wanted to question him: they reasonably believed that he was the "Ron" who had called, and they wanted to determine whether he was implicated in any criminal activity involving the narcotics which were the object of their search. Upon being invited by Pitchford to come inside, Weaver immediately began to retreat. These circumstances, viewed in their totality, gave rise to the officers' reasonable suspicion that Weaver had come to the residence with the intention of obtaining narcotics.

■ Weaver contends that at the time he arrived at the residence, the officers had not yet discovered any controlled substances, and that the officers' claim that they suspected Weaver of attempting to obtain illegal drugs was therefore objectively impossible. Because Bolinger and Pitchford knew they had no drugs to deliver to him, Weaver argues, they could not have had a reasonable suspicion that Weaver was about to commit the crime of attempted possession. In advancing this argument, Weaver misapprehends the nature of the offense of attempted possession. Because attempt to possess a controlled substance is an inchoate crime, it does not require completion of the act of possession. *See United States v. Dominguez,* 992 F.2d 678, 682 (7th Cir.) (citing *United States v. Haddad,* 976 F.2d 1088, 1094 (7th Cir. 1992)), *cert. denied,* —— U.S. ——, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993); *see also United States v. Valencia,* 907 F.2d 671, 683–84 (7th Cir.1990) (discussion of the elements of criminal attempt). Intent to obtain delivery of an illicit drug is a key element of the crime of attempted possession, and that intent may exist even where there are no drugs to be had. If, for example, "an individual with the intent to obtain [a controlled substance] is

duped into buying a faked substance, his intent to obtain the actual substance is established nonetheless." *Dominguez*, 992 F.2d at 682 (citing *United States v. Reeves*, 794 F.2d 1101, 1103 n. 2 (6th Cir.), *cert. denied*, 479 U.S. 963, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986), and *United States v. Everett*, 700 F.2d 900, 904–08 (3d Cir.1983)). Thus, even if Weaver's claim that the officers had no drugs to deliver to him were true, it does not undermine the objective reasonableness of the officers' suspicions. By the very fact that the officers had a search warrant, they had probable cause to believe that the controlled substances specified in the warrant were present at the residence. In light of all the facts known to them at the time they sought to question Weaver, Bolinger and Pitchford also had good reason to suspect that Weaver intended to obtain delivery of those substances, and thus were justified in stopping him.

■■■■■■ Once police have the reasonable suspicion needed to justify an investigatory stop, they may use the forcible means necessary to effectuate that stop, provided their actions are reasonable under the circumstances. It is well-established that "[a] measured use of force ... appropriate to accomplish the purposes of [the] investigatory stop" does not convert a *Terry* stop into an arrest. *Voida*, 963 F.2d at 958 (collecting cases). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97, 109 S.Ct. at 1872. Upon arriving at the front door and encountering Pitchford, Weaver immediately began to take evasive action. He moved rapidly away from the front door and appeared to be headed for a parked car in the street. Pitchford and Bolinger identified themselves as police officers, ordered him to stop, and began pursuing him. After Pitchford grabbed Weaver's jacket, Weaver broke free and ran. Weaver's escalating efforts to evade a reasonable request by the officers to stop fueled their suspicions that Weaver was involved in the narcotics crime they were investigating, *see*

*Voida*, 963 F.2d at 957–58, and justified their decision to use force to stop him. *See id.* at 958–59 & n. 6 (suspect cannot complain that police officer took forcible steps to detain him when the suspect's own evasive actions created the need for those steps). Viewed in this light, the district court's determination that Bolinger's tackling of Weaver did not cross the bounds of a permissible *Terry* stop is not clearly erroneous.

Weaver relies heavily on the recent Supreme Court case of *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), to bolster his claim that he was arrested without probable cause when Bolinger tackled him. In *Hodari D.*, the Court held that an arrest "requires either physical force ... or, where that is absent, submission to the assertion of authority." *Id.* at 626, 111 S.Ct. at 1551 (emphasis omitted). *Hodari D.* did not, however, involve a case where police began their investigation with a reasonable suspicion that criminal activity was taking place, the state having conceded that the police had no reasonable suspicion in the first instance to justify their investigatory stop. *Id.* at 623 n. 1, 111 S.Ct. at 1549 n. 1. This concession made it necessary for the Court to pinpoint precisely when the suspect was arrested in order to determine when his Fourth Amendment rights were implicated. *See id.* at 622–27, 111 S.Ct. at 1549–51; *see also Voida*, 963 F.2d at 956–57. In Weaver's case, there is no dispute that Weaver's encounter with police was from its inception an investigatory stop, and thus a "seizure" subject to Fourth Amendment scrutiny. Insofar as Weaver argues in the alternative that no Fourth Amendment seizure occurred before he was tackled (Reply Br. at 7–9), he undermines his own case. If this were so, it would only mean that the actions of police before they tackled Weaver need not be examined for a violation of Weaver's Fourth Amendment rights, not that the seizure was illegal when it occurred. The government does not argue that police had probable cause to arrest Weaver before Weaver kicked Officer Bolinger. *Cf. Voida*, 963 F.2d at 960 (flight from police may "provide information to ripen ... preexisting suspicions into probable cause") (alternative ground for holding no

Fourth Amendment violation). The only real issue, then, is whether the investigatory stop of Weaver escalated into a full-fledged arrest before police had probable cause to arrest. As we have already discussed, the district court's determination that the degree of force used to effectuate the stop was reasonable under the circumstances is not clearly erroneous.

B. *The application of § 3A1.2(b) of the Sentencing Guidelines.*

 The district court's determination that Weaver created a substantial risk of serious bodily injury to law enforcement officers for purposes of a three-level increase in his base offense level under U.S.S.G. § 3A1.2(b) is a question of the proper application of the Sentencing Guidelines to the facts. A district court's findings of fact are not disturbed unless they are clearly erroneous. *United States v. Atkinson,* 979 F.2d 1219, 1222 (7th Cir.1992). We also give "due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *see United States v. Kelly,* 991 F.2d 1308, 1316 (7th Cir.1993); *United States v. Herrera,* 878 F.2d 997, 999–1000 (7th Cir. 1989).

Section 3A1.2(b) provides for a three-level increase where a defendant assaulted a law enforcement officer "in a manner creating a substantial risk of serious bodily injury" to the officer. Application Note 5 provides that the guideline

> applies in circumstances tantamount to aggravated assault against a law enforcement ... officer, committed in the course of, or in immediate flight following, another offense, such as bank robbery.... [The] applicability [of this subsection] is limited to assaultive conduct against law enforcement or corrections officers that is sufficiently serious to create at least a "substantial risk of serious bodily injury" and that is proximate in time to the commission of the offense.

U.S.S.G. § 3A1.2(b), Commentary, application n. 5. The Supreme Court has recently ruled that the Commentary to a sentencing guideline is legally binding on the federal courts unless it conflicts with either the Constitution or federal statute. *Stinson v. United States,* —— U.S. ——, —— – ——, 113 S.Ct. 1913, 1917–18, 123 L.Ed.2d 598 (1993).

During the struggle that led to Weaver's arrest, Weaver stated that he did not want to go back to jail. From this remark, the district court concluded that Weaver knew that he was struggling with law enforcement officers. Moreover, the district court credited Bolinger's testimony that while the officers were trying to subdue him, Weaver was continually reaching inside his jacket to the area where he held the loaded .44 Magnum revolver. The court determined that this action by Weaver provided a sufficient basis for concluding that Weaver had created a substantial risk of serious bodily injury to the officers, and that a three-level increase in base offense level under § 3A1.2(b) was therefore proper.

Weaver contends that Bolinger's testimony concerning his arrest is insufficient to support the conclusion that he was attempting to draw his weapon in order to create a "substantial risk" of serious injury to the officers. Weaver argues that in reaching its conclusion, the district court made two assumptions which are unsupported by Bolinger's testimony: (1) that any movement of Weaver's hand to the left side of his jacket was toward the gun, and (2) that Weaver intended to draw the gun and place it in a position that would endanger the officers. Weaver also claims that at the time he allegedly made the reaching motion, it would have been physically impossible for him to draw the weapon because two police officers had him down on the ground and were tackling him.

A district court's factual findings may be deemed clearly erroneous "only if, after reviewing the entire evidence, we are left 'with the definite and firm conviction that a mistake has been committed.' " *Herrera,* 878 F.2d at 1000 (quoting *Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)). The district court based its findings on the testimony of both Officer Bolinger and Officer Young, who retrieved the loaded revolver from Weaver. Their testimony established that during the struggle leading to Weaver's arrest, Weaver repeatedly reached inside the

left side of his jacket with his right hand to the area where the handle of the revolver was well within his grasp. Weaver made this motion in the context of a violent struggle with police, during which he assaulted Bolinger by kicking him in the chest. His shouts of "Kill me, I don't want to go back to prison," demonstrated not only an awareness of the fact that his opponents in the struggle were law enforcement officers, but also that he felt a high degree of desperation. We note, moreover, that four police officers were engaged in the struggle before Weaver was finally subdued and handcuffed. The district court's determination that Weaver was reaching for his gun in order to use it against the officers is thus amply supported by the record.

The district court's conclusion that in trying to draw the revolver, Weaver created a "substantial risk of serious bodily injury" to the officers was also sound. The inherent dangerousness of a fully loaded .44 Magnum revolver is, of course, undisputed. Weaver does not contend that in order to have created a "substantial risk" of serious harm to the officers, it would have been necessary for him to draw the gun and point it at one of them; he only claims that it was physically impossible for him to do so because two of the officers were on top of him during the time that he was allegedly reaching for the gun. From this, Weaver asks us to conclude that the officers never faced a "substantial risk" of serious injury. As discussed above, Weaver's claim is contradicted by the great difficulty the officers had in restraining him. The officers' account of their violent struggle with Weaver, which underscored Weaver's assaultive conduct and the effort required to subdue him, thus provides sufficient ground for the district court's conclusion that § 3A1.2(b) applies in this case.

AFFIRMED.