UNITED STATES of America, Appellee,

v.

Kevin ASHLEY, Defendant–Appellant.

No. 97–1193.

United States Court of Appeals, Second Circuit.

Argued Feb. 5, 1998.

Decided April 7, 1998.

---

Roman E. Darmer II, Assistant United States Attorney, New York City (Mary Jo White, United States Attorney for the Southern District of New York, Craig A. Stewart, Assistant United States Attorney, New York City, on the brief), for Appellee.

Joan Palermo, New York City (Louis R. Aidala, New York City, on the brief), for Defendant–Appellant.

Before: KEARSE and WALKER, Circuit Judges, and WEINSTEIN, District Judge.[*]

KEARSE, Circuit Judge:

Defendant Kevin Ashley appeals from a judgment entered in the United States District Court for the Southern District of New York following his plea of guilty before Denny Chin, *Judge*, convicting him of distribution and possession with intent to distribute Phencyclidine ("PCP"), in violation of 21 U.S.C. §§ 812, 841(a)(1), 841(b)(1)(D) (1994). Ashley was sentenced principally to 96 months' imprisonment, to be followed by a four-year term of supervised release. On appeal, he contends (1) that the court erred in increasing his offense level under § 3A1.2(b) of the federal Sentencing Guidelines ("Guidelines") for assault on "official victim[s]" at the time of his arrest, and under Guidelines § 3C1.1 for obstruction of justice because of perjury in his suppression hearing testimony; and (2) that the court's upward departure from the Guidelines constituted improper enforcement of a term of a superseded plea agreement that had been rescinded because it erroneously calculated Ashley's sentencing range. For the reasons below, we affirm.

## I. BACKGROUND

### A. *Ashley's Arrest*

The events leading to the present prosecution are uncomplicated. On the evening of February 5, 1996, New York City Police Detectives Doheny and Wrobolonski, along with other officers assigned to the New York Drug Enforcement Task Force, including agents of the federal Drug Enforcement Administration, were conducting surveillance in the area of 165th Street and Walton Avenue in the Bronx. Doheny observed a person, later identified as Ashley, meeting with a series of individuals near that corner and making what appeared to be sales of narcotics. After one such transaction, an apparent purchaser was arrested and was found to be carrying narcotics; the officers then sought to question the apparent seller. Spotting Ashley walking near the site of the observed transactions, Doheny approached, displayed his detective shield, and asked to speak with Ashley. Ashley continued to walk away, and when Doheny said, "Stop, police," Ashley began to run. Doheny, joined by other officers, pursued.

After running for one or two blocks, Ashley was tackled by Wrobolonski; Wrobolonski and another officer attempted to handcuff Ashley, but Ashley struggled strenuously, flailing, elbowing, and kicking. Doheny and two other officers joined the effort to subdue Ashley; with Ashley still "fighting wildly," it took the five officers two or three minutes to get him under control.

As a result of the fight, four of the officers suffered injuries, including a sprained wrist and a sprained hand. The officers were taken to a hospital where they were treated and released. Ashley himself was treated for a head injury requiring several stitches.

### B. *The First Plea Agreement*

Ashley was indicted on two counts of distributing PCP and possessing PCP with intent to distribute it, and one count of assaulting a federal officer. Following the denial of a suppression motion, he entered into a written plea agreement with the government ("First Plea Agreement"), pursuant to which (a) the government would file a one-count superseding Information charging Ashley with distribution of and possession with intent to distribute PCP, (b) Ashley would plead guilty to that count, and (c) the government would file a Prior Felony Information

---

[*] Honorable Jack B. Weinstein, of the United States District Court for the Eastern District of New York, sitting by designation.

showing Ashley's prior state-court conviction of a narcotics offense, the effect of which would be to increase the statutory maximum prison term to which Ashley was subject in the present case from five years to 10 years, *see* 21 U.S.C. §§ 841(b)(1)(D), 851(a)(1) (1994).

The First Plea Agreement also contained various stipulations concerning the application of the sentencing guidelines, with the parties agreeing, *inter alia,* that Ashley was a career offender under Guidelines §§ 4B1.1 and 4B1.2 and that his Criminal History Category ("CHC") was VI; that his base offense level, premised on the 10–year statutory maximum for the offense of conviction, was 24; that his total offense level, after an acceptance-of-responsibility adjustment, was 21; and that the resulting Guidelines range of imprisonment was 77 to 96 months. The parties agreed that neither would seek any deviation from that range. In addition, Ashley waived his right to appeal a sentence within or below the stipulated range, and the government waived its right to appeal a sentence within or above that range.

Ashley pleaded guilty pursuant to the First Plea Agreement, and the probation office prepared a presentence report ("First PSR") recommending a 94–month term of imprisonment. The probation office's methodology differed from that of the parties, however, as the First PSR began with an offense-level calculation that, unlike the plea agreement, was not premised on the increased statutory maximum sentence resulting from Ashley's prior narcotics conviction. Rather, based on the quantity of narcotics involved, the First PSR found that Ashley's base offense level was 16; further, recommending that there be a downward adjustment of three steps for acceptance of responsibility pursuant to Guidelines § 3E1.1, and an upward adjustment of three steps pursuant to the "official victim" provision in Guidelines § 3A1.2(b) on account of Ashley's assault on the arresting officers, the First PSR calculated that Ashley's total offense level was 16. A total offense level of 16 and a CHC of VI would have resulted in a sentencing range of 46 to 57 months' imprisonment. However, the probation office recommended a five-level upward departure pursuant to Guidelines § 4A1.3, stating that a CHC of VI "appears to grossly under-represent the myriad criminal involvement of this defendant." (First PSR at 29.) Such a departure would have resulted in a sentencing range of 77 to 96 months, and the probation office recommended that the district court impose a term of 94 months.

Thereafter, the parties discovered that the First Plea Agreement was based on an erroneous reading of the then-applicable Guidelines' career offender provisions. Although the Prior Felony Information increased the statutory maximum sentence to which Ashley was subject, the Guidelines commentary in effect at that time indicated that that increased maximum should not have been used in calculating offense level under the career offender provisions. *See* Guidelines § 4B1.1 Application Note 2 (1995) (subsequently invalidated as inconsistent with statute, *see United States v. LaBonte,* — U.S. —, —–—, 117 S.Ct. 1673, 1677–79, 137 L.Ed.2d 1001 (1997), and amended, *see* Guidelines App. C, Amendment 567). The parties thus concluded that they should have calculated Ashley's offense level with reference to a statutory maximum of five years rather than 10. In light of their error in interpreting the Guidelines, Ashley moved to withdraw his plea, the government did not oppose, and the motion was granted.

### C. *The Second Plea Agreement and the Sentence*

Ashley and the government entered into a superseding plea agreement ("Second Plea Agreement"). Ashley again agreed to plead guilty to the single count charged in the superseding Information, and it was again agreed that his CHC was VI. After recalculating Ashley's base offense level under § 4B1.1, the parties concluded that his total offense level was 14 and that the applicable Guidelines range of imprisonment was 37 to 46 months. However, unlike the original plea agreement, the Second Plea Agreement provided that the parties were free to seek adjustments to or departures from that stipulated range:

The parties agree that either party may seek a downward or an upward departure or an adjustment from the Guidelines range set forth above. Accordingly, either party may seek such a departure or seek any adjustment not set forth herein. Either party may suggest that the Probation Department consider such a departure or adjustment, or may suggest that the Court *sua sponte* consider such a departure or adjustment.

(Second Plea Agreement at 6.) The Second Plea Agreement contained the same appeal restrictions as the initial agreement. Thus, to the extent pertinent here, Ashley retained his right to appeal a sentence above, but not within or below, the stipulated range.

Following Ashley's new guilty plea, another PSR was prepared ("Second PSR"). The probation office, whose analysis in the First PSR did not contain the flawed reliance on Ashley's increased statutory maximum sentence that appeared in the First Plea Agreement, adhered to its prior analysis. Thus, in the Second PSR, the probation office again calculated that Ashley's total offense level was 16, based on the same adjustments for acceptance of responsibility and assault on official victims, and it again recommended a five-level upward departure pursuant to § 4A1.3 to a sentencing range of 77 to 96 months, and an ultimate sentence of imprisonment for 94 months. The Second PSR also noted the government's contention that there should be an increase in offense level on the ground that Ashley had perjured himself at the suppression hearing; but it made no recommendation on that issue, deferring to the court as to whether an obstruction of justice had occurred.

Before sentencing, Ashley moved for a downward departure in order to enter a drug rehabilitation program while in prison. The government asked the district court to make the upward adjustments for assault on the officers and for obstruction of justice at the suppression hearing, and to depart upward from CHC VI as well. The court rejected Ashley's motion for a downward departure, granted the upward adjustments sought by the government, and decided to depart up-ward by four steps rather than the recommended five.

As to the "official victim" adjustment, the court stated that

the evidence shows, and I find, that Mr. Ashley, kicked, elbowed, punched, swung his arms, at the officers in a frenzied attempt to avoid being arrested. He was fighting with them wildly.

While it is true that the odds were five to one, there still is a substantial risk of serious bodily injury to someone who is on the receiving end of a punch or an elbow or, as [Assistant United States Attorney] Darmer points out, having a head slammed onto the pavement.

(Sentencing Transcript, March 27, 1997 ("S.Tr."), 28–29.) The court concluded that Ashley's melee with the officers created a "substantial risk of serious bodily injury," within the meaning of Guidelines § 3A1.2(b). The court also found that material portions of Ashley's testimony at the suppression hearing had been perjurious and that an obstruction-of-justice adjustment was warranted under Guidelines § 3C1.1.

As to the requested upward departure, the court found that a CHC of VI did not adequately reflect "the seriousness of Mr. Ashley's past criminal conduct or the likelihood that he will commit other crimes in the future." (S.Tr.30.) The court explained:

The PSR finds a total of 32 criminal history points for Mr. Ashley. You only need 13 points to get into Criminal History Category VI, and he has 32. Those 32 points were reached without giving any points at all for the first four convictions because those convictions occurred outside of the applicable time periods.

I count 18 prior convictions for crimes spanning from June 1984 through October 1989. That is 18 convictions for conduct in roughly a five-year period. Mr. Ashley was incarcerated then until October 1994. As soon as he got out he was arrested again two or three times. . . .

I have considered the nature of the prior offenses. While many of them are for less serious things, such as stealing tokens and petty larceny, one of the prior convictions

was for attempted robbery during which a victim was hit in the head with a radio. Another conviction was for assault with intent to cause serious physical injury.

On three of the other occasions Mr. Ashley resisted arrest or assaulted the arresting officer, something that he did in this case. On one of those occasions he attempted to take the arresting officer's gun. Eight of the convictions were for narcotics offenses.

Accordingly, I find that the Criminal History Category of VI does not adequately reflect the seriousness of Mr. Ashley's past criminal conduct or the likelihood that he will break the law again.

(*Id.* at 30–31.) The court departed upward by four levels, which in combination with the adjustments—including that for obstruction, which had not been included in the Second PSR's recommendations—resulted in a sentencing range of 84 to 105 months.

The court stated that although it would otherwise be inclined to sentence Ashley at the top of that range, it would, in light of the parties' original agreement on a range of up to 96 months' imprisonment, sentence Ashley to 96 months rather than 105: "Although I would be inclined to sentence at the top of the range, I will use the first plea agreement for Mr. Ashley's benefit and I will sentence him at 96 months." (*Id.* at 32.)

Judgment was entered accordingly, and this appeal followed.

## II. DISCUSSION

Ashley's principal contentions on this appeal are (1) that the § 3A1.2(b) adjustment was inappropriate because, given that he was unarmed and outnumbered, his struggle with the arresting officers did not create a substantial risk of serious bodily injury to them; (2) that there should have been no adjustment for obstruction of justice because his testimony at the suppression hearing should have been credited over that of the arresting officers, and that, in any event, the testimony found false was not material; and (3) that the court's upward departure was an improper attempt to reinstate the rescinded plea

agreement. We reject all of his contentions. Only the first and third warrant discussion.

### A. *"Official Victim" Adjustment*

■ The Guidelines provide for a three-step increase in the defendant's offense level, if

during the course of the offense or immediate flight therefrom, the defendant . . ., knowing or having reasonable cause to believe that a person was a law enforcement or corrections officer, assaulted such officer in a manner creating a substantial risk of serious bodily injury.

Guidelines § 3A1.2(b). In the version of the Guidelines applicable to Ashley, "serious bodily injury" was defined as

injury involving extreme physical pain or the impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. As used in the guidelines, the definition of this term is somewhat different than that used in various statutes.

Guidelines § 1B1.1 Application Note 1(j) (1995). This definition appears to encompass a wide range of injuries such as broken bones or other nonpermanent wounds that require "medical intervention such as surgery, hospitalization, or physical rehabilitation." *Id.* For the "official victim" adjustment to be applicable, however, "serious bodily injury" need not actually have occurred, so long as the defendant's conduct created a "substantial risk" of such injury. Guidelines § 3A1.2(b).

■ The defendant need not have been armed in order for his conduct to have posed such a risk; the lack of a weapon does not give an arrestee carte blanche to commit mayhem with his fists and feet. Nor does the fact that the defendant was substantially outnumbered by the arresting officers mean that his conduct did not pose such a risk. *See, e.g., United States v. Weaver,* 8 F.3d 1240, 1246 (7th Cir.1993) (sentencing court's conclusion that the defendant's conduct posed a substantial risk of serious bodily injury was supported by, *inter alia,* testimony that restraining the defendant required the strenuous efforts of four officers).

Disputed facts with regard to sentencing need only be proven by a preponderance of the evidence, *see, e.g., United States v. Mafanya*, 24 F.3d 412, 414 (2d Cir.1994); *United States v. Rivalta*, 892 F.2d 223, 230 (2d Cir.1989), and we must "accept the findings of fact of the district court unless they are clearly erroneous," 18 U.S.C. § 3742(e) (1994); *see, e.g., United States v. Fernandez*, 127 F.3d 277, 283 (2d Cir.1997); *United States v. Mafanya*, 24 F.3d at 414. We are to "give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e). Questions of whether the defendant knew his victims were officials and what actions he took are questions of fact. *See, e.g., United States v. Weaver*, 8 F.3d at 1245–46. The determination as to whether the defendant's conduct posed a "substantial risk of serious bodily injury" within the meaning of § 3A1.2(b) requires an analysis of the risks to the officers in light of the court's findings as to the nature of the defendant's conduct and involves an application of the Guidelines to the facts. *See United States v. Weaver*, 8 F.3d at 1245.

In the present case, though Ashley was unarmed, he kicked and swung and fought with such ferocity that it took five officers several minutes to subdue him. As a result of his conduct, four of the five officers were taken to a hospital for treatment. Although none of the injuries actually suffered were serious or required hospitalization, the fact that four officers required medical attention suggests that some more serious injury was a significant possibility. For example, the violence that caused a sprained wrist could easily have resulted in a broken wrist requiring surgery and/or rehabilitation. We cannot say that the district court's conclusion that Ashley's conduct created a substantial risk of serious bodily injury constituted a misapplication of § 3A1.2(b).

#### B. *The CHC Departure*

In challenging the court's upward departure, Ashley contends principally that his prior record was adequately reflected by CHC VI and that the departure resulted from the district court's desire to sentence him at the level that had been stipulated in the rescinded plea agreement (*e.g.,* Ashley brief on appeal at 22 ("most disturbing is the fact that the recommendation for an upward departure was obviously tainted by the earlier [PSR] and the previous erroneous plea agreement which had been vacated")). His contentions are unsupported by the record.

First, the fact that the probation office's recommendations in the Second PSR were identical to those in the First PSR provides no basis for challenge, for the probation office did not rely on the First Plea Agreement and did not make the error initially made by the parties in calculating Ashley's offense level on the basis of the increased statutory maximum sentence resulting from his prior narcotics conviction. The original PSR analysis was thus unaffected by the parties' discovery of their mistake.

Second, the record does not reveal any error in the district court's assessment as to whether an upward departure was warranted. Section 4A1.3 of the Guidelines authorizes such a departure from the prescribed range if the court finds that a defendant's criminal history category "significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes." Guidelines § 4A1.3. The court may depart upward even from category VI, the highest CHC:

> The Commission contemplates that there may, on occasion, be a case of an egregious, serious criminal record in which even the guideline range for Criminal History Category VI is not adequate to reflect the seriousness of the defendant's criminal history.

*Id.* "In determining whether an upward departure from Criminal History Category VI is warranted, the court should consider that the nature of the prior offenses rather than simply their number is often more indicative of the seriousness of the defendant's criminal record." *Id.* The district court's decision to depart is reviewed for abuse of discretion. *See, e.g., Koon v. United States*, 518 U.S. 81, 96–100, 116 S.Ct. 2035, 2046–47, 135 L.Ed.2d 392 (1996).

If the court decides that an upward departure from CHC VI is appropriate, it should structure the departure by moving incrementally down the sentencing table to the next higher offense level in Criminal History Category VI until it finds a guideline range appropriate to the case.

Guidelines § 4A1.3. We have held, however, that a district court imposing an upward departure from CHC VI need not follow a step-by-step analysis justifying the choice of successively higher guideline ranges, *see United States v. Harris*, 13 F.3d 555, 558–59 (2d Cir.1994); *United States v. Thomas*, 6 F.3d 960, 965–66 (2d Cir.1993), and that the extent of the departure is reviewed only for "reasonableness," *see, e.g., United States v. Harris*, 13 F.3d at 558–59; *United States v. Thomas*, 6 F.3d at 967. In determining whether the extent of the departure is reasonable, we

look "to the amount and extent of the departure in light of the grounds for departing" and "examine the factors to be considered in imposing a sentence under the Guidelines, as well as the district court's stated reasons for the imposition of the particular sentence."

*United States v. Campbell*, 967 F.2d 20, 26 (2d Cir.1992) (quoting *Williams v. United States*, 503 U.S. 193, 203–04, 112 S.Ct. 1112, 1121, 117 L.Ed.2d 341 (1992)). The central question is whether the " 'reasons given by the district court . . . are sufficient to justify the magnitude of the departure.' " *United States v. Campbell*, 967 F.2d at 26 (quoting *Williams v. United States*, 503 U.S. at 204, 112 S.Ct. at 1121).

We see no basis in the record for concluding that the district court misapplied these principles or that its four-level upward departure was unreasonable. The court found that CHC VI did not adequately reflect either the seriousness of Ashley's past record or the likelihood that he would commit crimes in the future. In so finding, the court did not consider simply the number of Ashley's prior offenses (which resulted in more than twice the number of criminal history points needed to reach CHC VI) and ignore their nature. Rather, stating that it "ha[d] considered the nature of the prior offenses"

(S.Tr.31), the court noted that while many of them were minor offenses, several others involved physical conflicts with arresting officers or other assaults with intent to inflict bodily injury; one involved an attempt to take the arresting officer's gun; and eight of his convictions were for narcotics offenses.

The court also noted a high degree of recidivism, pointing out that in one five-year period, Ashley had 18 convictions; further, following his subsequent imprisonment, he had promptly gotten himself arrested two or three more times. The court's view that CHC VI did not adequately reflect the likelihood that Ashley would commit still more crimes in the future was well supported by Ashley's record.

Finally, there is no support for Ashley's contention that, in departing upward, the court simply sought to resurrect the rescinded original plea agreement. Indeed, the court expressly stated, agreeing with Ashley's counsel, that "the intent ought not to be to try to get back to where we were originally," that is, to the sentencing range of 77 to 96 months stipulated in the First Plea Agreement. (S.Tr.9.) The court's explanation of its reasons for departing made no reference to that agreement, and its assessment of Ashley's criminal record did not lead it to the original range but led it to conclude that the appropriate range was 84 to 105 months. The court referred to the original plea agreement only in exercising restraint in selecting the precise sentence within the range it had found appropriate, in order not to go above the maximum sentence that the parties had initially envisioned. Thus, the court stated that "[a]lthough I would be inclined to sentence at the top of the [84–to–105–month] range, I will use the first plea agreement for Mr. Ashley's benefit and I will sentence him at 96 months." (S.Tr.32.)

We see in this record no basis for Ashley's contention that the district court used the rescinded plea agreement improperly.

## CONCLUSION

We have considered all of Ashley's contentions on this appeal and have found in them

no basis for reversal. The judgment of the district court is affirmed.