**UNPUBLISHED ORDER**
Not to be cited per Circuit Rule 53

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued July 11, 2006
Decided July 18, 2006

**Before**

Hon. WILLIAM J. BAUER, *Circuit Judge*

Hon. RICHARD A. POSNER, *Circuit Judge*

Hon. MICHAEL S. KANNE, *Circuit Judge*

| | |
|---|---|
| No. 05-4593 | |
| | Appeal from the United States District Court for the Southern District of Illinois |
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | |
| *v.* | No. 05 CR 30078 |
| JOEY S. HARRIS, *Defendant-Appellant.* | William D. Stiehl, *Judge.* |

**O R D E R**

Joey Harris was arrested after police stopped him on the street and found him carrying a gun and crack cocaine. He moved to suppress the gun and drugs on the basis that the stop was not supported by reasonable suspicion. When the district court denied the motion, Harris conditionally pleaded guilty to possessing a firearm after a felony conviction, *see* 18 U.S.C. § 922(g)(1), and possession with intent to distribute cocaine base, *see* 21 U.S.C. § 841(a)(1). He now challenges the denial of his motion to suppress, arguing that the district court erred in concluding that reasonable suspicion justified the investigatory stop. We affirm.

Two law enforcement officials testified at the suppression hearing. The first was Detective Dan Hill, a member of a joint task force in East St. Louis, Illinois, who along with Detective Ontourio Eiland was patrolling the area where Harris was stopped in a marked police car on April 17, 2003. Hill testified that the task force was interested in a particular intersection in East St. Louis because they had received complaints about, and arrested people for, "drugs and guns" there. At around 4:00 p.m. Hill noticed two men standing in front of a liquor store near that intersection, and so he stopped the car and let Detective Eiland out to approach the men. One of the men was wearing all black and the other, later identified as Harris, was wearing a leather coat that reached to his mid-thigh. Hill implied that it was unusual for Harris to be wearing a leather coat on what Hill considered a warm day; he was concerned that the coat could be used to conceal weapons.

As Detective Hill parked the car and joined Eiland and the man dressed in all black, another member of the task force, Deputy Marshal Tom Woods, arrived on the scene. According to Hill, Woods was focused on Harris, who by this time had begun walking away. Consequently, Woods asked Hill whether he had told Harris that he could leave; when Hill replied that he had not, the two officers started yelling at Harris to stop and chased after him. Harris eventually stopped, and Hill and Woods handcuffed him. Hill testified that the officers asked Harris whether he had anything illegal on him, and he replied that he had some crack. He also nodded toward his chest, where Woods turned up the gun during a pat-down.

On cross-examination Detective Hill admitted that, while he had not told Harris to leave, no one had told him to stay, either. Hill also testified that he and Eiland were really interested only in the man wearing black (for criminal trespass, though Hill admitted that he was unfamiliar with Illinois criminal-trespass law), and that while he saw the two men interacting, he did not see them doing anything illegal.

The government's other witness at the suppression hearing was Deputy Woods, a 19-year veteran of the United States Marshals Service. Woods was patrolling the same area as Detectives Hill and Eiland and, as he recalled at the hearing, observed "several" individuals outside the liquor store, where there had been complaints about open drug dealing in the past. Woods testified that he saw two individuals, one of them Harris, involved in what he believed to be a drug deal. Asked why he believed the two were involved in a drug deal, Woods replied that "they were facing each other outside the store, and all the business goes on on the inside," and he saw "one person hand something to the other." Woods testified that he was experienced with drug buys and drug arrests, and had investigated drug crimes before.

Deciding to talk to the two men, Woods parked and got out of his car, but by this time Harris was already walking away from the liquor store. To Woods it appeared that Harris was "trying to avoid contact with the police officers that approached the scene." Harris wasn't running, but he was walking away quickly. Woods confirmed Detective Hill's testimony that no one had told Harris to leave the area and that the two officers took off after Harris, yelling at him several times to stop. Woods testified that he was certain Harris had heard the officers and was disobeying them, so, for their safety, he drew his weapon as he approached. Hill caught up with Harris first, and when Deputy Woods arrived the two proceeded to handcuff him and discovered the gun and crack.

Deputy Woods was pressed on cross-examination to explain why he believed he had witnessed a drug deal. He responded that he "was suspicious that a drug deal had occurred," and that he "just wanted to speak to [Harris] at that time." Asked again what his suspicion was based on, Woods added his observation of a "transaction" taking place outside the business in an area where drug dealing had been reported. Woods could not articulate what was passed or who passed it to whom, but he did reiterate that Harris was one of the two involved in the transaction.

The defense called a single witness, an investigator for the federal public defender's office, who sponsored a document from the National Weather Service showing the temperatures on the date Harris was stopped. On that date at the time of the stop, the temperature was 51.8 degrees Fahrenheit.

The district court concluded that the stop was reasonable under *Terry v. Ohio*, 392 U.S. 1 (1968). The complaints about drug dealing in a high-crime area and Deputy Woods's observation of a hand-to-hand exchange provided, according to the court, more than enough to warrant stopping Harris. The court went on to find the manner of the stop reasonably related to the reason for the stop, noting that Harris did not respond to the officers' commands to stop, he was wearing a long coat that could conceal a weapon, Woods observed a drug exchange, and "drug dealers are often known to carry guns." The court also denied Harris's request to suppress incriminating statements he later made at the police station as tainted by the stop.

The sole question on appeal is whether Detective Hill and Deputy Woods had reasonable suspicion to stop Harris. The parties agree that a stop occurred, and they correctly assume that Harris was stopped only when Hill and Woods reached him and handcuffed him. *See Cal. v. Hodari D.*, 499 U.S. 621, 628-29 (1991)

(holding that an unrestrained subject is not seized until he submits to a "show of authority"); *United States v. Jerez*, 108 F.3d 684, 693 n.8 (7th Cir. 1997).

At that moment, Harris argues, the officers could not have had a reasonable suspicion that he was engaged in criminal activity. Although he acknowledges that the government advanced several facts to justify the officers' suspicion, Harris contends that the facts cannot, either alone or in combination, render that suspicion reasonable. Those facts are: (1) Harris was present in an area known for narcotics activity; (2) he was wearing a long coat; (3) Deputy Woods saw what he believed to be an exchange between Harris and someone else; and (4) Harris "walked quickly" away from the liquor store. For its part, the government counters that on the totality of these facts and in light of the officers' experience and training, their suspicion was reasonable.

Whether undisputed facts amount to a reasonable suspicion is a question of law reviewed de novo. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *United States v. Hagenow,* 423 F.3d 638, 641-42 (7th Cir. 2005). To establish reasonable suspicion, an officer must have a "'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 750 (2002) (citation omitted); *see Terry,* 392 U.S. at 30; *Hagenow*, 423 F.3d at 642. In other words, reasonable suspicion is "something less than probable cause but more than a hunch." *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003). Otherwise-innocent behavior can add up to a reasonable suspicion; the relevant inquiry is "the degree of suspicion that attaches to particular types of noncriminal acts." *United States v. Sokolow*, 490 U.S. 1, 9-10 (1989) (internal quotation marks and citation omitted); *see United States v. Hendricks,* 319 F.3d 993, 1001 (7th Cir. 2003).

The first three facts taken together do not give rise to a reasonable degree of suspicion that Harris was involved in criminal activity. Presence in a high-crime area alone does not justify a *Terry* stop but is relevant when linked with other suspicious facts. *Brown v. Texas*, 443 U.S. 47, 52 (1979). Combining it with the second fact—that Harris was wearing a thigh length leather coat that could be used to hide a weapon—does the government insufficient good, because simply wearing a leather coat in 50-degree weather provides a minimal degree of suspicion. Adding in Deputy Woods's testimony that he observed a hand-to-hand exchange still does not bring the officers' suspicion to a reasonable level. Other courts have recognized that an observed exchange or transaction can support a reasonable suspicion of drug dealing at least when the police can articulate what they saw exchanged and possess additional facts beyond the purported transaction supporting the suspicion. *See United States v. Williams*, 139 F.3d 628, 629-30 (8th Cir. 1998) (concluding that officer's observation of exchange of money for items produced from defendant's

pocket and held out to another, who selected from the offering, added to reasonableness of suspicion); *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993) (determining that group of men gathered around defendant looking down into his open palm increased reasonableness of officer's suspicion); *United States v. Garrett*, 959 F.2d 1005, 1007 (D.C. Cir. 1992) (crediting observation that defendant passed small object retrieved from inside his car to another in exchange for money). Here, though, Deputy Woods's conclusion that the exchange involved drugs is based on no particularized facts and is more akin to the very type of "hunch" that the Fourth Amendment protects against. *See Reid v. Ga.*, 448 U.S. 438, 441 (1980) (holding that suspect's presence in neighborhood frequented by drug users did not alone give officers reasonable suspicion). To support that Woods could have reasonably believed the exchange involved drugs, the government emphasizes his experience and training as a police officer. But the government fails to suggest what an experienced officer might know that would take this exchange out of the realm of innocent behavior. *See Johnson v. Campbell*, 332 F.3d 199, 208 (3d Cir. 2003) (noting that there are limits "to how far police training and experience can go towards finding latent criminality in innocent acts"); *cf. United States v. Humphries*, 372 F.3d 653, 655 (4th Cir. 2004) (crediting observation of officer with sixteen years' experience who saw suspect pat his waist and interpreted that as a "security check" for weapons).

That leaves Harris's quick departure from the scene in front of the liquor store. The government likens his hasty exit to the type of unprovoked flight considered in *Illinois v. Wardlow*, 528 U.S. 119 (2000). Harris counters that walking away from police is less evasive than the unprovoked flight the Supreme Court held probative of criminal behavior in *Wardlow*, 528 U.S. at 124. And that argument has some support, especially since an individual has the right to decline a police encounter, *see Fla. v. Bostick*, 501 U.S. 429, 437 (1991) (noting that refusal to cooperate alone cannot justify detention); *Fla. v. Royer*, 460 U.S. 491, 497-98 (1983) (plurality opinion) (recognizing that individual has right to ignore police and go about his business), and walking away from police can be an implicit exercise of that right, *see United States v. Patterson*, 340 F.3d 368, 371 (6th Cir. 2003); *cf. Moreno v. Baca*, 431 F.3d 633, 643 (9th Cir. 2005); *United States v. Valentine*, 232 F.3d 350, 357 (3d Cir. 2000).

But Harris did more than walk away; he refused to stop even after the officers ordered him to halt. We have held that walking away quickly in the face of commands by police officers to stop is evasive behavior that contributes to the reasonableness of an officer's suspicion. *See Lenoir*, 318 F.3d at 729; *United States v. Quinn*, 83 F.3d 917, 921-22 (7th Cir. 1996); *United States v. Weaver*, 8 F.3d 1240, 1244 (7th Cir. 1993); *see also Humphries*, 372 F.3d at 660; *United States v.*

*Franklin*, 323 F.3d 1298, 1302 (11th Cir. 2003). *But see United States v. Swindle*, 407 F.3d 562, 567-69 (2d Cir. 2005) (opining that even an order to stop should be based on reasonable suspicion but that in light of *Hodari D.*, 499 U.S. at 623-26, it need not be). Thus, when Harris disobeyed the officers, that fact coupled with the other information already known to them gave them reasonable suspicion. *See Lenoir*, 318 F.3d at 729. Since Harris has not advanced an argument about the reasonableness of the frisk, we conclude the district court properly denied his motion to suppress.

AFFIRMED.