WILLIAMS, Circuit Judge.
After the police noticed Plaintiff Scott Rabin carrying a holstered gun on his hip in public, he was handcuffed and detained for about one-and-a-half hours while the officers sought to confirm the validity of his carrying license. None of the three detaining officers were familiar with the unique license Rabin had on hand, one carried primarily by private detectives and security officers. When it was finally confirmed that Rabin’s license was legitimate, he was released. Rabin then sued the individual officers for unlawful arrest and excessive force, arguing that the officers should have known what that license was and should have released him as soon as he presented it. The district court denied the officers’ motion for summary judgment to the extent that it sought qualified immunity for both claims.
We find that the officers are entitled to qualified immunity on the unlawful arrest claim, because even if the officers had known what that type of license was, it still would have been reasonable under clearly established law for them to detain Rabin while they verified the legitimacy of a license to carry a deadly weapon. Though the length of Rabin’s detention was unfortunate, it was largely caused by the government’s failure to have an efficient system of license verification. As for Rabin’s excessive force claims, which allege that the unnecessary tightness of the handcuffs exacerbated his pre-existing medical conditions, the evidence shows that Rabin only told Deputy Sheriff Todd Knepper about his medical issues. So while Knepper is not entitled to qualified immunity on that claim, the other two officers are. Therefore we affirm the district court’s denial of qualified immunity for Knepper on the excessive force claim, but reverse the district court’s denial of qualified immunity for the rest of the claims.
*631 I. BACKGROUND
Because the officers moved for summary judgment, we construe the facts in favor of the plaintiff. On December 19, 2009, Plaintiff Scott Rabin, working as a licensed private investigator, was serving a court order on a registered corporate agent at an office complex in Buffalo Grove, Illinois. Deputy Michael Flynn, who was also serving process in that area, saw that Rabin was wearing a holstered gun on his hip. Flynn stopped Rabin and asked if he had a gun. Rabin said yes, explained that he was a licensed private investigator, and presented a carrying license called a “tan card” (formally called a “firearm control card”).[1] It is undisputed that Rabin’s tan card legally authorized Rabin to carry a gun at the time he was stopped by Flynn. See 225 ILCS 447/35-35.
Flynn, however, did not know what a tan card was. So he confiscated Rabin’s gun, which was fully loaded, and made a radio call to his dispatcher asking him to run the tan card through a system called LEADS (“Law Enforcement Agencies Data System”). The dispatcher said he could not verify the card through LEADS, that the tan card “might be a concealed carry card,” and that he would call the “Springfield desk.” After a few minutes, Flynn called the dispatcher again to see if Springfield knew anything about the tan card, and was told that it did not.
Deputy Sheriff Todd Knepper, who had heard on the radio that Flynn was with a man with a gun, arrived on the scene, confirmed that Rabin was the person who was armed, then handcuffed and searched him. Rabin repeated to Flynn and Knepper that he was authorized to carry the gun, but Knepper also did not know what a tan card was and put Rabin into the back of Knepper’s vehicle.
Deputy Sheriff John Quinlan then arrived in a “cage” car. Flynn updated him on the situation, but Quinlan also did not know what a tan card was. Knepper brought Rabin out of his vehicle and put him in Quinlan’s cage car for transport to the police station. Rabin then told the three officers that his handcuffs- were “tight.” Quinlan removed the handcuffs and placed his own handcuffs on Rabin (the parties agree that switching handcuffs in this manner is normal when someone is being transported to the station). Rabin then asked Knepper if the handcuffs could be left off, told him that he had a “bad neck” and a “bad hand in the past,” and that the second pair was even tighter than the first pair. Knepper did not do anything about the handcuffs, and Rabin was left in the cage car for about 25 minutes. During this time, Rabin tried to get the officers’ attention from within the closed car and yelled a couple times, “Can you please come here?”, but no one responded. Quinlan then removed the handcuffs and put Rabin in a non-cage squad car. Rabin was taken to the Buffalo Grove Police Department, a 30-minute drive.
Eventually, the Lake County State’s Attorney’s Office confirmed that Rabin could lawfully carry the gun. (There is nothing in the record that explains how exactly Rabin’s tan card was verified, or how the State’s Attorney’s Office came to be involved in the verification process.) Rabin *632 was then released. (Rabin’s brief asserts that the tan card was verified before his 30-minute trip to the police station, but none of the briefs citations supports such a fact or inference.) Construing the facts in the light most favorable to Rabin, he was detained for a total of about an hour- and-a-half, and it is undisputed that Rabin acted in a cooperative manner during the entire incident. Afterwards, Rabin allegedly suffered swelling and bruising to his wrists, muscle spasms in his neck, and needed to see a hand surgeon. He also had surgery on his neck to deal with the pains related to these injuries.
Rabin sued Flynn, Knepper, Quinlan, and other defendants including Cook County pursuant to 42 U.S.C. § 1983, for unlawful arrest and excessive force in violation of the Fourth Amendment. The defendants filed a motion for summary judgment, which the district court denied in relevant part, finding that Flynn, Knepper, and Quinlan were not entitled to qualified immunity. This appeal concerns solely the district court’s denial of qualified immunity for the three individual officers.
II. ANALYSIS
“The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Humphries v. Milwaukee Cnty., 702 F.3d 1003, 1006 (7th Cir.2012) (citations and quotation marks omitted). To be clearly established at the time of the challenged conduct, the right’s contours must be “sufficiently clear that every reasonable official would have understood that what he is doing violates that right,” and “existing precedent must have placed the statutory or constitutional question beyond debate.” Id. (citations and internal quotation marks omitted). This standard “protects the balance between vindication of constitutional rights and government officials’ effective performance of their duties by ensuring that officials can reasonably ... anticipate when their conduct may give rise to liability for damages.” Reichle v. Howards, — U.S. -, 132 S.Ct. 2088, 2093, 182 L.Ed.2d 985 (2012) (internal quotation marks and citation omitted). “[A] court may grant qualified immunity on the ground that a purported right was not ‘clearly established’ by prior case law without first resolving whether the purported right exists.” Humphries, 702 F.3d at 1006 (citing Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). The plaintiff carries the burden of defeating the qualified immunity defense, and we review the district court’s grant of summary judgment on the basis of qualified immunity de novo. Id. Where, as here, the denial of qualified immunity was based on an issue of law, we have jurisdiction to consider appeals from such denials. Hernandez v. Cook Cnty. Sheriffs Office, 634 F.3d 906, 912 (7th Cir.2011).
A. The Officers Are Entitled to Qualified Immunity On Rabin’s Wrongful Arrest Claim
Generally speaking, the Fourth Amendment permits officers to perform an investigatory stop if they have a reasonable and articulable suspicion of wrongdoing. Jewett v. Anders, 521 F.3d 818, 823 (7th Cir.2008). In evaluating the reasonableness of an investigatory stop, we examine whether the “‘officer’s action was justified at its inception’ ” and “ ‘whether it was reasonably related in scope to the circumstances which justified the interference in the first place.’ ” Id. (quoting Terry v. Ohio, 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). When an officer’s use of force during such a Terry stop *633 becomes so disproportionate to the purpose of such a stop in light of the surrounding circumstances—and the purpose may include ensuring the safety of the officers or others—then the encounter becomes a formal arrest (which must then be justified by probable cause). Id. at 824-25; United States v. Adamson, 441 F.3d 513, 520 (7th Cir.2006). “There is no bright-line rule as to how long an investigative detention may last; instead we look to whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions.” Id. at 521.[2]
Rabin acknowledges that Flynn’s initial investigatory stop of Rabin was “justified at its inception” because Rabin was visibly carrying a weapon, but argues that his detention became unlawful as soon as he presented his tan card, because any initial suspicion of wrongdoing or danger should have been immediately dispelled. He argues that the officers should have known that the relevant statute clearly authorizes tan card holders to carry concealed firearms in public. The defendants respond that officers cannot be expected to know every single provision of the law, including obscure exemptions to the unlawful public carrying statute that covers private detectives, nor should they be expected to anticipate affirmative defenses (they assert that the tan card is like an affirmative defense) that might excuse suspected misbehavior.
We agree with Rabin that a police officer’s suspicion of wrongdoing that is premised on a mistake of law cannot justify a Tern/ stop. We held in United States v. McDonald, 453 F.3d 958 (7th Cir.2006) that a “police officer’s mistake of law cannot support probable cause to conduct a stop,” id. at 961, however understandable that mistake of law might be, and we later applied that rule to the Terry stop context. See, e.g., United States v. Tyler, 512 F.3d 405, 411 (7th Cir.2008). This principle, however, does not help Rabin because it only makes sense in situations where a reasonable officer would know all the facts that he or she needs to determine whether the suspected activity is unlawful. For instance, in Pritchard v. Hamilton Township Bd. of Trustees, 424 Fed.Appx. 492, 506 (6th Cir. May 25, 2011), a case relied upon by both Rabin and the district court, the officers arrested an underage individual for consuming alcohol, but knew full well that he was drinking alcohol with his father. The Sixth Circuit found that the officers’ ignorance of the law—that Ohio law allowed underage drinking under the supervision of a parent—was no excuse for their arrest given the facts that they knew. See id. at 504-05. If, however, a reasonable officer would not have known that the supervising adult was actually his parent, it may not have been unreasonable to temporarily detain the teenager while reasonable steps were taken to promptly verify the adult’s parental status.
In this case, even if the officers should have known what a tan card was, the officers still did not know (or have reason to know) all the relevant facts to determine whether Rabin could lawfully *634 carry a gun in public[3]—specifically, whether Rabin’s tan card was legitimate. Under these circumstances, it would not be clearly unreasonable for an officer to believe that releasing an individual that may be unauthorized to carry a deadly weapon would present an unacceptable risk of danger to themselves or the public. See Jewett, 521 F.3d at 824 (“In evaluating whether the force that an officer used to effectuate the investigatory stop was so disproportionate to the purpose of such a stop as to convert the encounter into a full arrest, we consider whether ‘the surrounding circumstances g[a]ve rise to a justifiable fear of personal safety’ on the part of the officer....” (citation omitted)); United States v. Stewart, 388 F.3d 1079, 1084-85 (7th Cir.2004) (investigatory stop can be justified where the suspect is “potentially dangerous”); see also Schubert v. City of Springfield, 589 F.3d 496, 503 (1st Cir.2009) (“Just as an officer is justified in attempting to confirm the validity of a driver’s license, such a routine check is also valid and prudent regarding a gun license.”). And though we are troubled by the use of handcuffs in the context of a Terry stop even after Rabin’s gun (the primary source of danger) had been confiscated, an officer could have reasonably believed under clearly established law at that time that handcuffs may be used during a Terry stop when dangerous weapons are generally involved. See, e.g., Stewart, 388 F.3d at 1085. But see Ramos v. City of Chicago, 716 F.3d 1013, 1018 (7th Cir.2013) (“The proliferation of cases in this court in which ‘Terry ’ stops involve handcuffs and ever-increasing wait times in police vehicles is disturbing, and we would caution law enforcement officers that the acceptability of handcuffs in some cases does not signal that the restraint is not a significant consideration in determining the nature of the stop.”). Though Rabin’s brief suggests that the officers should have simply let him go as soon as he presented his tan card, he fails to point to any case clearly establishing that officers are required to take such documents at face value, especially when the authorization to carry a fully loaded handgun is at stake. In other words, Rabin does not show that the individual officers failed to “diligently pursue! ] a means of investigating that was likely to confirm or dispel quickly their suspicions” that Rabin was not authorized to carry a gun. Adamson, 441 F.3d at 521.
At oral argument, Rabin’s counsel acknowledged that officers may reasonably attempt to verify the legitimacy of a gun license before releasing a license-holder. But Rabin asserts that the officers could have instantly verified the tan card. He says that there is a “publicly accessible database through which the [tan] card can be verified within seconds” whose web address “appears on the face of the [tan] card itself,” and that “Plaintiff even told the officers to look at the card for the verifying information, but they refused to do so.” However, neither of these factual assertions (made at oral argument and in his brief) are supported by any citations to the record. Perhaps for good reason, because the photocopy of the front and back of Rabin’s tan card found in the record did not have any web address on it at all. See Dist. Ct. Dkt. Nos. 67-3 at 69-70; 64-1 at 17.[4] To the extent some other part of the *635 record indicates otherwise, it is counsel’s responsibility to point it out. See Gross v. Town of Cicero, 619 F.3d 697, 702 (7th Cir.2010) (“As we have repeated time and again, ‘Judges are not like pigs, hunting for truffles buried in [the record].’ ” (citation omitted)). And because the web address was not on Rabin’s tan card, his assertion that he told the officers to “look at the card” for the verifying information is irrelevant even if it were true.
We do not intend to suggest that taking one-and-a-half hours to simply verify a gun license is reasonable under these circumstances. Cf. Illinois v. Caballes, 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005) (“A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.”); Arizona v. United States, — U.S. -, 132 S.Ct. 2492, 2509-10, 183 L.Ed.2d 351 (2012) (discussing whether state law requiring verification of immigration status before release would result in unconstitutional prolonged detention). But there is no evidence that the individual officers (or their ignorance of the law) were responsible for the prolonged verification process. When Flynn was presented with the tan card, he did not sit there scratching his head, but promptly turned to other channels in an attempt to verify it. Perhaps the police department or other relevant government agency should have had a system in place that could more efficiently verify tan cards. But Rabin does not point to any cases clearly establishing that individual officers are personally responsible for curing such systemic failures, which is hard to imagine given that such failures are likely outside their control. Cf. Thomas v. Cook Cnty. Sheriff’s Dept., 604 F.3d 293, 304 (7th Cir.2009) (“If, for instance, the officer had pled an affirmative defense such as good faith, then the jury might have found that the plaintiffs constitutional rights were indeed violated, but that the officer could not be held liable. In that case, one can still argue that the City’s policies caused the harm, even if the officer was not individually culpable.”); Woodward v. Correctional Med. Sews, of Ill., Inc., 368 F.3d 917, 929 (7th Cir.2004) (employee’s “lack of training and carelessness” relevant to establishing liability of employer, even if employee was not found liable). Rabin correctly notes that under the roughly analogous circumstances of Schubeit, decided after the events here, the officer let the plaintiff go after a few minutes as soon as he realized that verifying the gun license “could take a significant amount of time,” Schubert, 589 F.3d at 500, since “Massachusetts did not have a simple way for police officers to conduct such a check.” Id. at 503. But even if this decision had been issued as of the time of Rabin’s detention, it does not clearly say that an officer’s failure to let someone go after a few minutes under similar circumstances is a constitutional violation. See also Estate of Escobedo v. Bender, 600 F.3d 770, 781 (7th Cir.2010) (discussing limited role of non-controlling precedent in qualified immunity analysis).
In sum, given the safety risks at stake, it was reasonable under clearly established law for the officers to temporarily detain Rabin pending the verification of his gun carrying license, even if the officers had known about the tan card exemption under the law. His prolonged detention was then caused by systemic failures outside the individual officers’ control. So the officers are entitled to qualified immunity on Rabin’s wrongful arrest claim.
B. Officers Flynn and Quinlan Are Entitled to Qualified Immunity On Rabin’s Excessive Force Claim
Rabin also asserts an excessive force claim against the officers, alleging *636 that his handcuffs were overly tight and exacerbated his preexisting medical conditions. When an officer stops or arrests an individual, some degree of physical force may be used, but the Fourth Amendment requires that the degree of force used be reasonable. Stainback v. Dixon, 569 F.3d 767, 772 (7th Cir.2009). “In this respect, our cases indicate that an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury.” Id. In Stain-back, which was decided prior to Rabin’s detention, we found that the arresting officers did not use excessive force in that case, but we explained, “[h]ad the Officers known of a preexisting injury or medical condition that would have been aggravated by handcuffing Mr. Stainback, or had Mr. Stainback communicated to the Officers that he suffered from such an infirmity, the Officers certainly would have been obligated to consider that information, together with the other relevant circumstances, in determining whether it was appropriate to handcuff Mr. Stainback.” Id. at 773.
Here, Rabin proffers evidence that he directly told Officer Knepper about his “bad neck” and “bad hand in the past” and that the handcuffs were overly tight,[5] and it was undisputed that Rabin was cooperative the entire time. Given that Rabin was already handcuffed, no reasonable officer who was aware of Rabin’s medical conditions would have believed that exacerbating Rabin’s medical problems (i.e., by keeping the handcuffs as tight as they were) was necessary to ensure safety, and that doing so would be permissible under clearly established law. Therefore, Knepper is not entitled to qualified immunity at this summary judgment stage, and he will have an opportunity at trial to dispute Rabin’s story or explain why he did not loosen the handcuffs. Officers Flynn and Quinlan, however, are entitled to qualified immunity because there is no evidence that Rabin specifically made them aware of his medical history, and his other generalized complaints of pain are insufficient to show excessive force. See Stainback, 569 F.3d at 773 (“These generalized complaints, without any elaboration regarding a preexisting injury or other infirmity, would not have placed a reasonable officer on notice that Mr. Stainback would be injured by these actions.”).
III. CONCLUSION
For the above-stated reasons, we Reverse the district court’s denial of the defendants’ motion for summary judgment to the extent that it sought qualified immunity for Flynn, Knepper, and Quinlan for the wrongful arrest claim and for Flynn and Quinlan for the excessive force claim. We Affirm the district court’s denial of the motion for qualified immunity for Knepper for the excessive force claim. And we Remand this case for proceedings consistent with this opinion.

. The firearm control card is called a "tan card” because of the unique tan color of the card. See Haywood v. City of Chicago, 378 F.3d 714, 715 (7th Cir.2004) (a " ‘tan card' ... certifies that the cardholder, being employed by a licensed security agency ... and having received firearms training, may carry a weapon while working or commuting”). Rabin also presented Flynn a Private Detective License and a Firearm Owner's Identification Card, but these cards did not independently authorize Rabin to carry a firearm and are not directly relevant to our analysis.

. The parties frame the dispute as being about whether the officers’ initial investigatory stop ever became a formal arrest, but the core of the dispute is really over whether Rabin’s presentation of his tan card should have been enough to assure the officers that Rabin was acting lawfully. If it was, then the officers lacked both reasonable suspicion and probable cause to continue detaining Rabin, whether or not Rabin's detention is considered a Teny stop or a formal arrest. If not, then reasonable suspicion along with safety considerations may have been enough to justify a Terry detention while the license was being verified.

. The relevant events took place before Moore v. Madigan, 702 F.3d 933 (7th Cir.2012) was decided.

. According to that part of the record, Rabin's Private Investigator License did include a website, but nothing on that card suggested that the tan card could be verified at the website indicated in the brief.

. Rabin's brief asserts that he told Quinlan about the bad neck and bad hand injury, but the record citation indicates that he actually-told Knepper about it.