In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1256

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DARIUS R. HOWARD,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 12-CR-83-BBC — **Barbara B. Crabb**, *Judge.*

ARGUED MAY 28, 2013 — DECIDED AUGUST 30, 2013

Before EASTERBROOK, *Chief Judge*, and WILLIAMS and
HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Appellant Darius Howard pled
guilty to unlawful possession of a firearm by a felon, 18 U.S.C.
§ 922(g)(1), and possession of crack cocaine with intent to
distribute, 21 U.S.C. § 841(a)(1), but he reserved his right to
appeal the district court's denial of his motion to suppress
evidence. On appeal Howard challenges both the denial of his
motion to suppress and his sentence.

We affirm both the denial of the motion to suppress and the sentence. The police had sufficient reason to stop Howard briefly in the course of making a potentially dangerous arrest of Howard's associate on suspicion of violent, armed crimes. Once Howard was stopped, the discovery of the drugs in his pocket became inevitable. Police officers noticed that he and his associates had bloodstains on their clothes. The police then quickly found a gun wrapped in a bloody shirt in their vehicle. Within moments, Howard and his associates were identified as suspects in a very recent armed robbery and were arrested. Because we affirm the drug conviction, Howard's challenge to the Sentencing Guideline calculation on his firearm conviction is moot. His below-guideline sentence on the drug charge was reasonable.

I.   *The Motion to Suppress*

   A.  *Factual and Procedural Background*

Police Detective Matthew Wiza was staking out a parking lot looking for Marcus Johnson in Fitchburg, Wisconsin, when a van known to be associated with Johnson arrived. Detective Wiza had probable cause to arrest Johnson for pistol-whipping a man at a bar one week earlier. Johnson was also a suspect in a recent shooting. As the van parked, Detective Wiza radioed for backup and drove toward the van.

Johnson exited the vehicle with another man, later identified as Christopher Carthans, and walked toward an apartment building. Detective Wiza exited his vehicle and drew his gun, believing that Johnson could be armed and dangerous. When Wiza was 15 to 20 feet from Johnson, he was surprised when two more men, defendant Darius Howard and Ari

Williams, exited the same van.[1] Until that moment, Detective Wiza had believed that only two men had been in the van. He suddenly felt that he was "kind of in a bad situation because I was in between two groups of individuals and I was outnumbered." Detective Wiza turned his gun toward Howard and Williams, who were closer to him, and ordered all four men to the ground to control the situation until other officers arrived.

Officer Mike O'Keefe arrived on the scene moments later. He approached Johnson and Carthans while Wiza kept his attention on Howard and Williams. Officer O'Keefe proceeded to arrest Johnson. Johnson, however, made it difficult for O'Keefe to handcuff him. Carthans took advantage of this distraction and fled the scene. (He was later captured.) After successfully arresting Johnson, Officer O'Keefe searched him incident to arrest and found 11 grams of crack cocaine in a sandwich bag in his pocket. He also noticed that Johnson had bloodstains on his jeans and shoes. Officer O'Keefe then secured Johnson in his patrol car.

As Officer O'Keefe was arresting Johnson, Detective Wiza continued to detain Howard and Williams. Wiza testified that Howard had complied with his commands, was not acting "suspiciously in any way," and was not "making any [furtive] movements." Additionally, Carthans had not yet fled at this point. Nevertheless, Detective Wiza decided to place Howard in handcuffs and frisk him for weapons for the officers' safety.

---

[1] In its recitation of the facts, the government refers to Howard and Williams as "two more black males." We do not understand how the race of these men is relevant to the issues on appeal. We trust this was just careless drafting on the part of the government.

Because Detective Wiza had only one pair of handcuffs, he frisked Howard with only one hand, keeping his gun trained on Williams with the other.

After placing Johnson in his patrol car, Officer O'Keefe came to help Detective Wiza. As he approached Howard and Williams, Officer O'Keefe noticed that both, like Johnson, had blood on their clothing. O'Keefe handcuffed Williams and then frisked both Williams and Howard for weapons. He believed a weapons frisk was necessary "[b]ecause of the incident that had occurred, because of the high-risk stop and because of the circumstances that were taking place at our contact." The district court found as a fact that when Officer O'Keefe frisked Howard, he did not know that Detective Wiza had already given Howard a brief, one-handed frisk. (Howard contends that the district court's factual determination was an error. As explained below, this disputed point does not matter.)

Officer O'Keefe's frisk of Howard was more thorough. While moving his hand over Howard's pocket, O'Keefe felt what he believed to be a sandwich bag. O'Keefe testified that he suspected there were drugs in the bag because he had found a sandwich bag with drugs in Johnson's pocket moments earlier. O'Keefe tested this suspicion by squeezing the object between his fingers until he felt a hard substance. He then reached into Howard's pocket and pulled out a sandwich bag that contained half an ounce of crack cocaine.

At that moment, Howard and Williams were both handcuffed, Johnson was handcuffed and in the patrol car, and Carthans was still at large. Detective Wiza began to investigate the reason all the men had blood on their clothes. He briefly

searched the van and found a baseball bat and a gun wrapped in a bloody shirt.[2] Soon after, City of Madison police arrived and said that the men were suspects in an armed robbery that had occurred in Madison less than an hour earlier. (Howard later told the police that he used the shirt to wipe the robbery victim's blood off the gun at Johnson's request. This was the basis for Howard's federal conviction for possession of a firearm.) Howard, Williams, and Carthans were arrested by Madison police for the armed robbery.

Howard was also charged in federal court with the firearm and drug offenses, and he moved to suppress the crack cocaine and the statements he made to police following his arrest. He argued that his detention and the second frisk that found the drugs violated the Fourth Amendment because the police had no basis to stop and frisk him. The district judge referred the matter to a magistrate judge to conduct a suppression hearing. The magistrate judge concluded that both the stop and the frisk were reasonable measures to protect the police officers during an unexpectedly chaotic encounter. See *United States v. Howard*, 12-CR-83-BBC, 2012 WL 5389673 (W.D. Wis. Oct. 22, 2012). Howard objected to the report. The district judge reviewed the motion and reached the same result. Howard then pled guilty but reserved his right to appeal the suppression ruling.

We review the district court's legal conclusions *de novo* and its factual determinations for clear error. *United States v.*

---

[2] The magistrate judge found that Officer O'Keefe had seen the bloody shirt when he first arrived on the scene. The district judge chose not to rely on that finding, and we follow suit, but that finding would create a stronger case for the stop earlier on.

*Clinton*, 591 F.3d 968, 971 (7th Cir. 2010). Under clear error review, "we will not overturn the district court's factual findings unless we are left with a definite and firm conviction that the district court was mistaken." *Id.* (quotation omitted). We review *de novo* mixed questions of law and fact, such as whether the stop and frisk were constitutional. *United States v. Burnside*, 588 F.3d 511, 517 (7th Cir. 2009).

We consider separately whether first the stop and then the frisk were constitutional. See *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968); *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999). We affirm the denial of the motion to suppress because (1) the *Terry* stop of Howard was reasonable, and (2) regardless of whether the frisk was constitutional at the moment it occurred, the evidence Howard seeks to suppress inevitably would have been discovered lawfully and independently of any arguable constitutional violation. See *Nix v. Williams*, 467 U.S. 431, 444 (1984); *United States v. Marrocco*, 578 F.3d 627, 637-38 (7th Cir. 2009). We begin with the stop of Howard.

B.  *The Terry Stop*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures … ." Generally, a seizure is "'reasonable' only if based on probable cause." See *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013), quoting *Dunaway v. New York*, 442 U.S. 200, 213 (1979). The Supreme Court has long recognized, however, that police may briefly stop people on reasonable suspicion that is less than probable cause. To determine whether such intrusions are constitutional, courts balance the intrusion on personal liberty

with the governmental interest in making the seizure. See *Terry*, 392 U.S. at 20–21; see also *Bailey*, 133 S. Ct. at 1037 (recognizing line of cases holding police intrusions based on less than probable cause lawful where "the intrusion on the citizen's privacy was so much less severe than that involved in a traditional arrest that the opposing interests in crime prevention and detection and in the police officer's safety could support the seizure as reasonable") (quotations omitted).

Applying this interest-balancing approach to the question of reasonableness, the Supreme Court has recognized limited situations at the scene of police activity in which it may be reasonable for police to detain people not suspected of criminal activity themselves, so long as the additional intrusion on individual liberty is marginal and is outweighed by the governmental interest in conducting legitimate police activities safely and free from interference. See, *e.g.*, *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (police may detain anyone on residential premises being searched pursuant to lawful search warrant, regardless of individual suspicion); *Maryland v. Wilson*, 519 U.S. 408, 413–15 (1997) (police may order passenger out of stopped car without suspicion; "risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation"), quoting *Michigan v. Summers*, 452 U.S. 692, 702–03 (1981); see also *Brendlin v. California*, 551 U.S. 249, 258 (2007) ("It is also reasonable for passengers to expect that a police officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety.").

In this case, it was reasonable for the police to stop Howard in the course of arresting Johnson. The police were attempting

to make a dangerous arrest based on probable cause. They had a substantial interest in making the arrest safely and without interference. Police officers executing searches for weapons, supported by probable cause, have a legitimate interest in securing the premises they enter. See *Los Angeles County v. Rettele*, 550 U.S. 609, 613 (2007) (per curiam); *Muehler*, 544 U.S. at 100. A similar interest was present here.

Detective Wiza was alone and was attempting to arrest Johnson for a violent crime involving a gun. He was surprised when Johnson's associates exited the same van. He reasonably concluded that they presented a potential threat to his ability to arrest Johnson safely. Though Detective Wiza did not have any particular reason at that moment to believe Howard, Williams, or Carthans was dangerous, he was justified in at least being cautious of those accompanying Johnson. By ordering Howard, Williams, and Carthans to the ground, Detective Wiza was able to control the movement of those at the scene, to ensure that there was no interference, and to keep them out of any potential lines of fire. This step increased the likelihood that Johnson would be arrested safely.

We recognize that this intrusion on Howard's liberty was substantial. See *Terry*, 392 U.S. at 16–17. Being ordered to the ground at gunpoint is a substantial infringement on individual liberty under any circumstances. Howard was not only denied freedom of movement but could reasonably have been terrified by a firearm aimed at him. Anyone watching the scene might well have believed that he was under arrest. The seizure was significant but still did not amount to a full arrest and therefore did not need to be supported by probable cause. See *United States v. Weaver*, 8 F.3d 1240, 1244 (7th Cir. 1993) (measured use

of force does not turn seizure into arrest). On these facts, the governmental interest in ensuring that the police could safely arrest Johnson without worrying about those who had just exited the same vehicle with him outweighs this brief but significant intrusion on Howard's liberty. Essential to this conclusion are the facts that the police had probable cause to believe Johnson had committed a crime of violence with a gun, and that the other men had been riding with him in the same van. These facts are critical because they made the concern for officer safety specific and strong. It was reasonable for Detective Wiza to seize Howard briefly in the course of arresting Johnson.

These limits on our reasoning are important. We have previously held that similar detentions of bystanders violated the Fourth Amendment when the police did not have probable cause to believe the target of the arrest or search had committed a violent crime or was otherwise dangerous. See *Baird v. Renbarger*, 576 F.3d 340, 344–45 (7th Cir. 2009) (unreasonable for police officer to point submachine gun at compliant bystanders when executing search warrant involving non-violent crime where there was no known threat to safety and no one tried to resist or flee; distinguishing cases finding such conduct reasonable when danger to police was supported by probable cause); *Jacobs v. City of Chicago*, 215 F.3d 758, 773–74 (7th Cir. 2000). The specific reasons to think Johnson may have been armed and dangerous in this case distinguish these and other similar cases.

The duration of the seizure also fit this justification. Howard was seized—on this precautionary basis—for only a few minutes until Johnson was arrested. Then Officer O'Keefe

came over and almost immediately noticed facts that gave the police particularized suspicion to continue to keep Howard on the scene. Johnson, Howard, and Williams all had blood on their clothing, clearly justifying further inquiry. The suspicion quickly rose higher when the police discovered a bloody gun in the van where Howard had just been riding and then learned that he and the others were potential suspects in a very recent armed robbery. These facts all provided reasonable suspicion for the officers to keep Howard at the scene to investigate the bloodstains and the bloody gun after the justification for the initial seizure (the need to arrest Johnson safely) ended. See *Terry*, 392 U.S. at 30.

Further, it is still imperative that the police not take shortcuts that leave them in dangerous situations requiring greater uses of force. If police were to wait for a suspect to be in a crowd when there was a clear opportunity to arrest him alone, a seizure of others in the area might well be found unreasonable. Any arguable necessity for those seizures would have been created by the actions of the police and not the necessities inherent in ordinary police work. See *United States v. Johnson*, 170 F.3d 708, 721 (7th Cir. 1999) (Evans, J., concurring) ("If the police use a shortcut and a need to protect themselves arises, they run the risk of not being able to use, in court, evidence they stumble on.").

Regarding the seizure, Howard also argues that the use of handcuffs was not justified and made his seizure unreasonable. Handcuffs in a *Terry* stop and frisk are not and should not be the norm. See *Rabin v. Flynn*, — F.3d —, 2013 WL 3455689, at *4 (7th Cir. 2013); *id*. at *8–*10 (Rovner, J., concurring); *Ramos v. City of Chicago*, 716 F.3d 1013, 1018 (7th Cir. 2013) ("The

proliferation of cases in this court in which '*Terry*' stops involve handcuffs … is disturbing, and we would caution law enforcement officers that the acceptability of handcuffs in some cases does not signal that the restraint is not a significant consideration in determining the nature of the stop."). Their use is not always unconstitutional, though, at least where police officers can point to specific reasons for believing that handcuffing the particular person during the stop was needed for safety or to prevent flight. See *Rabin*, — F.3d at —, 2013 WL 3455689, at *8–*10 (Rovner, J. concurring) (reviewing case law); *United States v. Stewart*, 388 F.3d 1079, 1084–85 (7th Cir. 2004) (approving handcuffing and seating person suspected of armed bank robbery in back of police car); *United States v. Smith*, 3 F.3d 1088, 1095–96 (7th Cir. 1993) (approving handcuffing persons suspected of drug trafficking where officer based action on safety concerns, the time of night, the general environment, and the nature of the offenses); see generally *Muehler*, 544 U.S. at 100 ("safety risk inherent in executing a search warrant for weapons was sufficient to justify the use of handcuffs, the need to detain multiple occupants made the use of handcuffs all the more reasonable"). On the other hand, when particularized suspicion is lacking, restrictive means of detention generally run afoul of the Fourth Amendment. See, *e.g.*, *Baird*, 576 F.3d at 344–45; *Jacobs*, 215 F.3d at 773–74.

Detective Wiza handcuffed Howard moments after ordering him to the ground. At that time Wiza had no specific reason to believe that Howard was involved in criminal conduct or a threat. Howard was lying on the ground and was compliant before he was handcuffed, and according to Wiza's

testimony, Carthans had not yet fled. The application of handcuffs without any particularized suspicion that Howard was a threat made the seizure much more intrusive.

But even if the use of handcuffs might have been unconstitutional, that would not require suppression of the evidence. The application of handcuffs increased the severity of the seizure but did not prolong it or permit the discovery of evidence that would not have been discovered otherwise. With or without handcuffs, the brief detention of Howard was lawful and remained so through the time that police saw the blood on him and found the gun in the car. The discovery of the blood and the gun justified his continued detention. If the application of handcuffs had been clearly unconstitutional, the proper remedy would have been a suit against the officers under 42 U.S.C. § 1983, not suppression of the evidence. See *Rabin*, — F.3d at —, 2013 WL 3455689 at *4 (affirming qualified immunity for officers who handcuffed subject in *Terry* stop to investigate whether his possession of firearm was lawful); *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (affirming denial of qualified immunity where officer pointed submachine gun at cooperative persons present at execution of search warrant regarding non-violent crime); *El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 459–60 (8th Cir. 2011) (denying qualified immunity for the use of handcuffs during a *Terry* stop); *Bowden v. Town of Speedway*, 539 F. Supp. 2d 1092, 1101 (S.D. Ind. 2008) (granting detainee's motion for summary judgment where he was kept handcuffed in police car long after basis for *Terry* stop had been resolved).

C. *The Second Frisk*

Howard does not challenge the first frisk, which yielded no evidence. We turn to whether the second frisk was reasonable. The power to conduct a *Terry* stop does not automatically give police the power to frisk the subject for weapons. *Terry*, 392 U.S. at 27. There must be a separate inquiry into whether the frisk was constitutional, see *United States v. Brown*, 188 F.3d 860, 864 (7th Cir. 1999), which depends on whether the police had a reasonable belief that the person was armed and dangerous. *Terry*, 392 U.S. at 27. Such suspicion must be specific to the person being searched and may not arise from mere proximity to criminal conduct. See *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979) ("The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place."); see also *Maryland v. Buie*, 494 U.S. 325, 334 n.2 (1990) ("Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires reasonable, individualized suspicion before a frisk for weapons can be conducted.").

Howard's primary argument is that it was unreasonable for Officer O'Keefe to frisk him because O'Keefe knew that Detective Wiza had already frisked him. The district court found as a fact that O'Keefe did not know about the prior frisk by Wiza. We see no error of fact or law on this issue. The district court's finding of fact was reasonable and certainly not clearly erroneous. And even if the factual finding had been erroneous, it is not necessarily unreasonable for police to frisk a person more than once when he has been seized on the

rapidly evolving scene of police activity. See *United States v. Robinson*, 615 F.3d 804, 806-08 (7th Cir. 2010) (not unreasonable for officer to frisk defendant a second time at a chaotic scene).

The proper inquiry is whether the frisk was reasonable on the facts known to the officer at the relevant moment. There are many cases where a first frisk misses a hidden weapon, sometimes with consequences that are serious or worse. Even if Officer O'Keefe had known that Detective Wiza had given Howard a brief frisk, it would have been reasonable to frisk him a second time as long as he had a credible reason to believe that Wiza might have missed a dangerous weapon. The propriety of the second frisk turns on whether Officer O'Keefe had reasonable suspicion to believe that Howard, at the moment he frisked him, was a threat to officer safety.

When Officer O'Keefe searched Howard, Johnson had been successfully arrested, and Howard was lying handcuffed on the ground. Neither Detective Wiza nor Officer O'Keefe articulated any specific reason for believing that Howard was then a threat to their safety. Detective Wiza testified that he had no reason to suspect that Howard was dangerous. Officer O'Keefe justified the frisk "[b]ecause of the incident that had occurred, because of the high-risk stop and because of the circumstances that were taking place at our contact." True, Carthans had fled by this point and the police investigation was ongoing, but a frisk for weapons requires particularized suspicion to justify the intrusion. It is difficult for us to see any particularized suspicion that Howard was armed and dangerous at that moment.

In the end, though, we need not decide conclusively whether the search exceeded the constitutional limits on *Terry* frisks. Even if the frisk was unconstitutional, suppression would not be justified as a remedy. The police would have discovered the evidence independent of the potential constitutional violation, bringing this case within the inevitable discovery doctrine.

D. *Inevitable Discovery*

The inevitable discovery doctrine permits the government to introduce evidence seized in violation of the Fourth Amendment "if the Government can prove, by a preponderance of the evidence, that the officers 'ultimately or inevitably would have … discovered [the challenged evidence] by lawful means.'" *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009), quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984). To meet this burden, the government must demonstrate both (1) that "it had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence" and (2) "that it would have conducted a lawful search absent the challenged conduct." *Id*. at 637–38. Both requirements are met in this case.

While Howard was still being lawfully detained, the police discovered bloodstains on his and the other men's clothing, and then found the gun in the bloody shirt in the van. These discoveries allowed the police to extend the detention of Howard while they investigated the source of the blood.

Within minutes, the police discovered that the blood was probably from the victim of a recent armed robbery in which Howard and the others were suspects. The Madison police

arrived quickly, confirmed that Howard matched the description of one of the suspects, and arrested him. Thus, independent of the frisk by Officer O'Keefe, Howard would have been searched lawfully incident to that arrest. See *Davis v. United States*, 131 S. Ct. 2419, 2424 (2011) (recognizing rule that "officer who makes a lawful arrest may conduct a warrantless search of the arrestee's person"). The crack would have been discovered then, independent of any arguable violation involved in the second frisk.

No step in that hypothetical sequence would have violated the Fourth Amendment or depended on any Fourth Amendment violation. The two aspects of the actual events that raise the most serious constitutional questions—the handcuffing and the frisk—are independent of this chain of events. The handcuffs did not prolong the seizure, and the police discovered the bloodstains, gun, and bloody shirt so quickly that arrest and a search incident to arrest were inevitable. Even if the second frisk was not lawful, the motion to suppress was properly denied.

II. *Sentencing*

The district court sentenced Howard to concurrent prison sentences of 120 months for the gun offense and 180 months for the drug offense. Howard raises two challenges to his sentence: (1) that the district court improperly applied an armed robbery cross-reference when calculating the guideline range for the gun offense, and (2) that his below-guideline 180-month sentence for the drug offense was unreasonable. Neither argument is persuasive.

A. *Armed Robbery Cross-Reference*

Howard first argues that the district court incorrectly calculated his offense level for the gun offense by erroneously applying an armed robbery cross-reference for his involvement in the earlier armed robbery. The guideline for unlawful possession of a firearm instructs the court to use the offense level for another offense in the guideline calculation, here armed robbery, if the defendant possessed the firearm during the other offense and the offense level for the other crime would be greater. U.S.S.G. § 2K2.1(c)(1)(A). Howard argues that the cross-reference should not apply because he did not possess the gun during the robbery itself but only afterward. The cross-reference raised the base offense level for Howard's gun offense from 24 to 33. Howard's base offense level for the drug offense, however, was 34, meaning the guideline range for the drug offense was greater than for the gun offense.

Howard raised this argument to preserve it in the event that the drug conviction was overturned, but counsel correctly noted at oral argument that the issue would not matter if we affirm the denial of the motion to suppress because the 120-month sentence for the firearm offense runs concurrently with the longer 180-month sentence for the drug offense. Regardless of whether the cross-reference was correctly applied, the length of Howard's sentence remains the same: 180 months. We need not decide whether the cross-reference was properly applied in this case.

B. *Reasonableness of the 180-Month Sentence*

Howard also argues that his 180-month sentence was erroneous because the district judge (1) did not comment on

his arguments that prosecutorial heavy-handedness was the real reason he was a career offender and that the federal sentence should run concurrently with any state-imposed sentence, and (2) imposed a substantively unreasonable sentence. We review *de novo* the procedural argument that the court failed to consider Howard's arguments, see *United States v. Marin-Castano*, 688 F.3d 899, 902 (7th Cir. 2012), and we review the substantive reasonableness of a sentence for abuse of discretion, see *Gall v. United States*, 552 U.S. 38, 46 (2007). The district court must show that it exercised its discretion by commenting on a defendant's principal arguments that are "not so weak as not to merit discussion," *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005), but "little explanation is necessary when a court decides to impose a sentence within the Guidelines range." *United States v. Tyra*, 454 F.3d 686, 688 (7th Cir. 2006). Howard's 180-month sentence was below the correctly calculated guideline range of 188 to 235 months and is presumed reasonable in an appeal by the defendant. See *United States v. Poetz*, 582 F.3d 835, 837 (7th Cir. 2009).

The district court adequately considered Howard's arguments. The judge considered and rejected Howard's argument that a more lenient sentence would have been appropriate because he qualified as a career offender only because of prosecutorial heavy-handedness. The judge rejected the premise of the argument, explaining that Howard was "so close to aging out that either he was—either he was waived into adult court or he wouldn't have any kind of a sentence to serve at all in response to a crime that involved someone having eight stitches." The judge then went on to explain why

the 180-month sentence was reasonable based on the particular circumstances of the case: Howard had been involved in criminal activity since he was thirteen years old, had shown no sign of stopping, continued to possess firearms after being convicted of a felony, and posed a continuing threat to the community. This response shows that the judge considered and rejected Howard's argument that the guideline range did not accurately reflect his criminal history. See *Poetz*, 582 F.3d at 838 (noting that a full "[e]xplanation is not necessary where anyone acquainted with the facts would have known without being told why the judge had not accepted the argument") (quotations omitted).

The judge also acknowledged and rejected the argument that the sentence should run concurrently with any state-imposed sentence. District judges now have discretion to order a federal sentence to run concurrently with or consecutively to an *anticipated* state sentence. *Setser v. United States*, 132 S. Ct. 1463, 1473 (2012). The judge expressly declined to order concurrent state and federal sentences. The judge said she had spent a lot of time thinking about the sentence and had ultimately decided to reject a sentence concurrent with a state sentence, believing it was important that Howard serve a 15-year federal sentence. This explanation was minimal but sufficient to show that the judge exercised her discretion by considering Howard's argument. See *United States v. Curby*, 595 F.3d 794, 797 (7th Cir. 2010) (per curiam) (general statement that judge considered argument is a sufficient exercise of discretion; distinguishing previous cases requiring remand on ground that they involved unaddressed arguments).

Finally, the 180-month sentence is substantively reasonable. It was below the applicable guideline range and therefore is presumed reasonable on an appeal by the defendant. See, *e.g.*, *Poetz*, 582 F.3d at 837. The district judge considered the statutory factors under 18 U.S.C. § 3553(a). She discussed the nature and circumstances of the offense and Howard's personal characteristics, and she explained the need for a long sentence to protect the public, to promote respect for the law, and to provide Howard with correctional programming. The judge also expressed regret that there was not an alternative to a prison sentence and discussed Howard's mitigating arguments concerning his difficult childhood. The judge gave this case serious consideration and settled on a reasonable below-guideline sentence.

The judgment of the district court is AFFIRMED.