HAMILTON, Circuit Judge,
concurring in part and concurring in the judgment.
I join the portions of Judge Stadtmuel-ler’s opinion holding that the frisk of defendant Williams violated his constitutional rights and that no good-faith exception is available to avoid the exclusionary rule. I also therefore join in the judgment to reverse the judgment of the district court and to remand for further proceedings.
I do not join the portion of the opinion (Part II-B-1) holding that the police officers could lawfully carry out a Terry stop of Mr. Williams. That portion of the opinion is not actually necessary to the judgment, and the question is a close one, *691 especially as state law and federal constitutional law have been evolving to provide expanded protection for individual possession of firearms in public. See Rabin v. Flynn, 725 F.3d 628, 637-41 (7th Cir.2013) (Rovner, J., concurring); Moore v. Madigan, 702 F.3d 933, 942 (7th Cir.2012) (striking down Illinois law prohibiting most people from carrying firearms in public), reh’g en banc denied, 708 F.3d 901 (7th Cir.2013); State v. Hamdan, 264 Wis.2d 433, 665 N.W.2d 785, 811-12 (2003) (reversing conviction for carrying concealed weapon; store owner carried concealed weapon in his store for his security in high crime neighborhood). In essence, as public possession and display of firearms become lawful under more circumstances, Fourth Amendment jurisprudence and police practices must adapt.[1]
A Terry stop requires reasonable suspicion that the individual subject has committed or is about to commit a crime. Terry v. Ohio, 392 U.S. 1, 22-23, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); see also United States v. Place, 462 U.S. 696, 702, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). To focus on the facts of this case, the 911 caller here reported that three or four people in a group of approximately twenty-five had “guns out” outside a troublesome bar. When asked by the 911 operator, she said they were not fighting, taunting, or threatening each other. She also said she did not see anyone pointing guns at anyone else.
When the 911 call came in shortly after 11:00 p.m., the entire night shift of the Fitchburg Police Department, six or seven officers, was at headquarters for the nightly briefing. AH the officers responded immediately. Within five minutes, they arrived outside the bar with their own “guns out.” The officers found eight to ten people remaining outside the bar. But by the time of the officers’ arrival, no guns were visible, nor was anyone in the remaining group acting in a suspicious way that officers could later identify at the suppression hearing, except that the people did not make eye contact with officers and they began to walk slowly away from each other. Cf. Illinois v. Wardlow, 528 U.S. 119, 124-25, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (subject’s unprovoked flight from police arriving in high-crime area supported Terry stop). The police officers moved in. They stopped and started to frisk everyone on the scene, including Williams.
Did the police have reasonable suspicion to justify a Terry stop of everyone, or of Williams in particular? I doubt it, but the question is close enough that the better course would be to bypass the question and reverse because the frisk of Williams was not justified, as Judge Stadtmueller has explained.
Let’s start by asking what crime was suspected or feared here? The government does not specify, but the best candidate for an actual crime is disorderly conduct, with or without Wisconsin’s enhancement for disorderly conduct with a dangerous weapon. See Wis. St. § 947.01(1) (disorderly conduct); § 939.63 *692 (enhanced penalties for committing crimes while armed with dangerous weapon). The disorderly conduct statute outlaws “violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance,” but with a new and important qualification discussed below.
Without the mention of the guns, there was just a gathering of people talking loudly outside a bar, so my colleagues’ conclusion about the authority for a Terry stop here stands or falls on the significance of the 911 caller’s report that three or four individuals had “guns out.”[2] From the 911 call, it’s clear that the visible guns frightened the caller. They also gave the police officers good reason to be cautious, but that is not necessarily enough to justify the intrusion of a Terry stop. Even a Terry stop alone, without a frisk, still requires a “particularized and objective basis for suspecting the particular person stopped of criminal activity.” United States v. Cortez, 449 U.S. 411, 417-18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).
The qualification about disorderly conduct is based on a new Wisconsin law. The incident here occurred on March 21, 2012. Some months earlier, Wisconsin had amended its disorderly conduct statute to protect civilians’ rights to possess and even display loaded firearms in public places. Before July 2011, the disorderly conduct statute had provided:
Whoever, in a public or private place, engages in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct under circumstances in which the conduct tends to cause or provoke a disturbance is guilty of a Class B misdemeanor.
Wis. Stat. § 947.01 (2010). In 2011, as part of a comprehensive rewrite of firearm laws in Act 35, Wisconsin added the following paragraph to the disorderly conduct statute to protect the rights to possess and carry firearms openly in public:
(2) Unless other facts and circumstances indicate a criminal or malicious intent on the part of the person apply, a person is not in violation of, and may not be charged with a violation of, this section for loading, carrying, or going armed with a firearm, without regard to whether the firearm is loaded or is concealed or openly carried.
Wis. Stat. § 947.01(2) (2012).
The new Wisconsin statute makes it clear that the persons on the scene could not have been arrested for disorderly conduct for displaying guns, for there was no indication of “criminal or malicious intent.” The 911 caller said first that several people had “guns out” and later that they were “waving” the guns but not threatening anyone. Visible guns may be disturbing to those nearby, but that’s the point of the new Wisconsin statute. Merely possessing or displaying a gun without criminal or malicious intent does not violate the law, even if the display is disturbing or frightening to others. A Terry stop does not require probable cause for an arrest, of course, but it still requires reasonable sus *693 picion of genuinely criminal conduct. Based on the new Wisconsin law, that is hard to find on this record.
In questioning the authority for a Terry stop here, I do not mean to suggest that the police could not or should not have responded to the 911 call. The caller reported what might have been a dangerous mixture of alcohol and guns late at night outside a bar known to the police as a trouble spot. I recognize that the blend of firearms and alcohol late at night could have become dangerous and/or criminal within a split-second. It was appropriate to respond to the 911 call with a strong and visible police presence, one that involved talking with people on the scene when they arrived. Such police actions do not raise Fourth Amendment issues and may do a great deal to prevent trouble. See Florida v. Rodriguez, 469 U.S. 1, 5-6, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (initial contact when officers asked civilian if he would step aside and talk with them was “the sort of consensual encounter that implicates no Fourth Amendment interest”), citing United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.), and Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality); 4 Wayne B. LaFave, Search and Seizure § 9.4, at 560 (5th ed.2012). In fact, that visible presence is. the sort of police response the 911 caller asked for, not the much more aggressive response that occurred.
Going beyond a strong and visible police presence, to Terry stops, however, is a significant step with important consequences. When courts say that a Terry stop is authorized, they are authorizing what Terry itself recognized is a “seizure” of the person that could involve substantial infringement on personal liberty. 392 U.S. at 16-17, 88 S.Ct. 1868. When a. Terry stop is authorized, the subject of the stop is not free to walk away. The officer is authorized to use reasonable force to require the subject to submit to the stop. Place, 462 U.S. at 702, 103 S.Ct. 2637; Adams v. Williams, 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972); 4 La-Fave, Search and Seizure § 9.2(d), at 413.
What was it about this situation that could lead us to conclude that it was reasonable to stop Mr. Williams from simply walking away from the officers? There was no individualized suspicion concerning him. And the entire group, which had dwindled from about twenty-five to eight or ten people, was peaceful and, for all the officers knew, law-abiding. There was nothing like the suspicious casing of a store window that provided reasonable suspicion in Terry. Nor was there any conduct like that in the principal cases relied upon by my colleagues. In United States v. Hicks, 531 F.3d 555, 557 (7th Cir.2008), the emergency caller reported, “There’s a guy beating a woman up in my house,” and that the man had a pistol and was threatening to shoot the woman. That was a report of a crime and a real emergency. There was nothing comparable reported here. Or in United States v. Wooden, 551 F.3d 647, 648 (7th Cir.2008), the 911 call said that an armed man was arguing with his girlfriend, had a gun in a holster, and had pulled out the gun. That was not as volatile as the report in Hicks but was still closer to criminal conduct than was reported here.
The amended Wisconsin disorderly conduct statute requires some indication of criminal or malicious intent before a person’s possession of a firearm in public, whether concealed or visible, can contribute to a violation. Moreover, we have held that the Second Amendment includes at least some individual right to carry a gun in public, subject to restrictions that re *694 main to be tested in court. Moore, 702 F.3d at 942. After Heller and McDonald, all of us involved in law enforcement, including judges, prosecutors, defense attorneys, and police officers, will need to reevaluate our thinking about these Fourth Amendment issues and how private possession of firearms figures into our thinking. See Rabin, 725 F.3d at 636-37 (Rov-ner, J., concurring) (noting that private citizens in Illinois may soon be carrying firearms in public, resulting in more investigatory stops and a need to define and respect limits for such stops). As we work our way through those issues case by case, we also need to recognize genuine safety concerns of police officers and citizens, as well as the potential for intentional or unintentional discrimination based on neighborhood, class, race, or ethnicity.
Five or six years ago, I would have had little trouble agreeing "with my colleagues that the police here faced a potential emergency and that a Terry stop was justified. But the combination of Heller, McDonald, and Moore under the federal Constitution, and Wisconsin’s laws, including the 2011 amendment to its disorderly conduct statute and adoption of Article I, section 25 of its Constitution, together convince me that the calculus is now quite different. I have no doubt that these changes in the law make the work of police officers more difficult and more dangerous. I also fear that human and institutional responses to those dangers may increase the risk of profiling based on race, ethnicity, dress, class, or neighborhood. The new constitutional and statutory rights for individuals to bear arms at home and in public apply to all. The courts have an obligation to protect those rights for people in bad neighborhoods as well as good ones. See McDonald v. City of Chicago, — U.S. -, 130 S.Ct. 3020, 3087-88, 177 L.Ed.2d 894 (2010) (Thomas, J., concurring in the judgment) (explaining historical importance of individual right to bear arms for black citizens in defending themselves from racially-motivated violence by whites).
For these reasons, I concur in only part of Judge Stadtmueller’s opinion and in the judgment to reverse and remand the case.

. To describe federal constitutional law as “evolving” is to use a loaded term these days. There can be little doubt, though, that District of Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008), overturned the established federal constitutional understanding that the Second Amendment did not provide an individual right to bear arms independent of a State militia, or that McDonald v. City of Chicago, - U.S. -, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010), reinterpreted an amendment intended to protect the powers of States and made it applicable against States. See, e.g., United States v. Cruikshank, 92 U.S. 542, 553, 23 L.Ed. 588 (1875) (Second Amendment applied only to Congress; States remained free to restrict or protect the right to bear arms under their police powers).

. The facts here do not support the conclusion that the police were responding to an ordinary disorderly conduct call. They were responding to a 911 call about guns, and the guns were the reason the situation was treated as an emergency calling for the entire shift to respond. The government does not argue that the group outside the bar — either the original group of twenty-five or the remaining group of eight to ten — or any individual within the group was "unreasonably loud” or "boisterous,” possibly triggering the disorderly conduct statute without considering whether or not individuals in the group were also armed.