In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-1674

SHAUN J. MATZ,

*Plaintiff-Appellant,*

*v.*

RODNEY KLOTKA, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:08 CV 00494— **Rudolph T. Randa**, *Judge.*

ARGUED SEPTEMBER 9, 2013 — DECIDED OCTOBER 6, 2014

Before POSNER, ROVNER, and HAMILTON, *Circuit Judges.*

ROVNER, *Circuit Judge.* Shaun J. Matz brought this action
under 42 U.S.C. § 1983 against a number of current and former
Milwaukee Police Department officers. He claims that in
September 2003 the officers violated his Fourth and Fifth
Amendment rights by arresting him without reasonable
suspicion or probable cause, failing to make a prompt probable
cause determination once he was under arrest, and continuing

to question him after he invoked his right to remain silent. The district court granted summary judgment to the defendants, and Matz appeals. We affirm the grant of summary judgment in favor of the defendants on Matz's § 1983 claims.

**I.**

Because we are reviewing the district court's grant of summary judgment against Matz, we recount the facts in the light most favorable to him, noting discrepancies in the parties' version of events where relevant. *See Zepperi-Lomanto v. Am. Postal Workers Union,* 751 F.3d 482, 483 (7th Cir. 2014). On the evening of September 16, 2003, Matz and several other individuals were on the porch of an apartment located at 1335 South Layton Boulevard in Milwaukee, Wisconsin. That same evening two Milwaukee police officers then assigned to the warrant squad, defendants Rodney Klotka and Karl Zuberbier, were driving through the area on an unrelated matter. Klotka and Zuberbier were both in uniform and were driving an unmarked squad car. As they drove down Layton Boulevard, Zuberbier, who was the passenger, saw an individual named Javier Salazar standing with the others on the porch. Zuberbier recognized Salazar from a warrant squad briefing as a member of the Latin Kings gang who he believed was wanted for armed robbery. Specifically, Zuberbier thought there was a "temporary felony want" for Salazar, who Zuberbier believed was also a suspect in two homicides and several shootings. Zuberbier pointed out Salazar to Klotka, who looked over at the individuals on the porch.

By the time Klotka was able to make a U-turn and approach the apartment, everyone on the porch was leaving. Matz

admits having seen the police, but claims that he had already left the porch when their car turned around. He acknowledges having heard someone say "detects" as he was leaving the porch. When Klotka pulled up to the curb, Zuberbier jumped out and ran along the south side of the house where several of the individuals had headed. Klotka followed shortly behind him. As Zuberbier ran into the alley he saw three people starting to run southbound down the alley and two more people in a car starting to drive away. As he ran towards the car, he drew his gun and pointed it at the vehicle while shouting, "Police! Stop!" Matz says that Zuberbier also threatened to blow his "fucking head off" if he did not stop. Klotka, who by that point also had his gun drawn, arrived right behind Zuberbier and ordered Matz and the vehicle occupants to get out and keep their hands visible.[1] Although the parties differ as to the precise order of the events that happened next, it is clear that the following occurred within a short period of time after the stop: (1) Matz was handcuffed and put into a patrol car; (2) it came to light that the car he was driving was stolen; and (3) other officers (at least six squads total) arrived at the scene in response to a call for backup. Klotka then briefly left the scene to ascertain if anyone else from the porch was still in the vicinity. And although there is conflicting testimony as to which officer arrested Salazar, it is

---

[1]  Although it is immaterial to Matz's claim, there is a dispute about the order in which the officers arrived on the scene and who directed Matz out of the vehicle. Klotka recalls arriving first, pointing his gun, and ordering the car to stop, but Matz recalls that it was Zuberbier who first arrived and gave the command to stop. Klotka also recalls that another officer removed Matz from the vehicle while he left the scene to search for the others.

undisputed that he was arrested shortly thereafter inside the residence.

According to Matz, while he was in the patrol van Michael Caballero, a detective in the homicide division, grabbed his left arm and stated, "he's one of them" when he saw Matz's tattoos. Matz also alleges that Caballero questioned him about two homicides and continued to do so after Matz said he did not want to talk about it and wanted an attorney. Matz was then taken to the city jail, where he was booked and given a cell. The next morning two more homicide detectives, Shannon Jones and Percy Moore, interviewed Matz about the homicides and an armed robbery. Matz claims that although he told Jones and Moore from the outset that he did not wish to speak to them about the homicides and wanted to go back to his cell, they continued questioning him for over three hours. Later that same evening, Caballero and another defendant, Detective Mark Walton, again interrogated Matz in the face of his insistence that he did not want to talk. Matz says Walton acknowledged Matz's rights but insisted that he give them a statement anyway. After several hours of questioning, Matz, who was sitting in a "defeated" position, provided a statement admitting his involvement in the homicides. Throughout this period Matz was never provided with various medications he had been taking for psychosis and depression (Olanzapine, Prozac, Klonopin, and Neurontin). He alleges that being without his medication impaired his thought process, affected his impulsivity, and caused him to make poor decisions. He was also at this time still recovering from pneumonia, for which he had been hospitalized until two days before his arrest on September 16. He later recanted his inculpatory statement

and named Salazar as the shooter, although he admitted being present. He said he confessed because he believed it was the only way he could return to his cell. Despite recanting his statement, Matz pleaded guilty to one count of first-degree reckless homicide and one count of felony murder with robbery as the underlying crime. The Milwaukee County Circuit Court sentenced him to a total of sixty years imprisonment and forty-five years extended supervision between the two counts.

Matz was not presented for an initial in person appearance before a court commissioner until seven days after his arrest. To support their claim that Matz received an adequate probable cause determination, the defendants submitted an "arrest-detention report" signed by a Milwaukee County Court Commissioner at 10:58 a.m. on September 18, 2003—less than two days after his initial arrest. The report reflects Commissioner Liska's determination that probable cause existed to believe that Matz committed a crime and her decision setting cash bail at $100,000.00.

Matz initiated this suit under § 1983 in 2010, alleging that Klotka, Zuberbier, Jones, Moore, Walton, and Caballero violated his Fourth and Fifth Amendment rights. The district court appointed counsel, who filed a second amended complaint and added an additional Fifth Amendment claim against certain defendants. Ultimately the district court granted summary judgment in favor of the defendants on all of Matz's claims. The court concluded that Matz had failed to establish that his Fourth Amendment rights were violated because Klotka and Zuberbier had reasonable suspicion to detain Matz when he attempted to leave the scene and that no reasonable

factfinder would conclude that the officers lacked probable cause for his subsequent arrest. Relying on the arrest-detention report submitted by the defendants, the district court also concluded that it was undisputed that Matz had received a timely probable cause determination. Finally, the district court rejected Matz's Fifth Amendment claim based on his allegedly coerced confession, concluding that because both his conviction and sentence depended in part on the confession, Matz's challenge was barred by *Heck v. Humphrey*, 512 U.S. 477, 487 (1994).

## II.

We review the district court's grant of summary judgment de novo. Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *e.g.*, *Hawkins v. Mitchell*, 756 F.3d 983, 990-91 (7th Cir. 2014). We construe the evidence in the light most favorable to Matz as the non-moving party, and draw all reasonable inferences from the evidence in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Miller v. Gonzalez*, ---- F.3d ----- 2014, 2014 WL 3824318, at *4.

### A. Reasonable Suspicion for a *Terry* Stop

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Ordinarily seizures are "reasonable" only when supported by probable cause to believe an individual has committed a crime. *See*, *e.g.*, *Dunaway v. New York*, 442 U.S. 200, 213 (1979); *Bailey v. United States*, 133 S. Ct. 1031, 1037 (2013). The longstanding exception to this rule arises under *Terry v. Ohio*, 392 U.S. 1

(1968), which authorizes brief investigatory detentions based on the less demanding standard of reasonable suspicion that criminal activity is afoot, *id.* at 21-22; *United States v. Baskin*, 401 F.3d 788, 791 (7th Cir. 2005). Such a brief detention is permitted when it demands only a limited intrusion into an individual's privacy and rests on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Determining whether such an investigatory detention is constitutional requires balancing the governmental interest in the seizure against the degree to which it intrudes on an individual's personal liberty. *See id.* at 20-21. And although reasonable suspicion is a less demanding standard than probable cause, such a stop requires at least a minimal level of objective justification and the officer must be able to articulate more than an "inchoate and unparticularized suspicion or 'hunch'" of criminal activity. *Id.* at 27; *see also Ill. v. Wardlow*, 528 U.S. 119, 123-24 (2000). Ultimately, determining whether reasonable suspicion exists is not an exact science, and "must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125.

Although Matz insists that Officers Klotka and Zuberbier have demonstrated nothing beyond an unparticularized hunch to support their decision to stop his car, the record establishes otherwise. The officers both saw and recognized Salazar from their warrant squad briefings, where he was identified as a member of the Latin Kings gang wanted in connection with an armed robbery. Zuberbier had also been told that Salazar was a suspect in several homicides. And by the time the officers were able to make a U-turn and approach the building in an

attempt to speak with Salazar, every individual on the porch was leaving the scene.[2] During the chase that ensued, officers had no way of knowing where exactly Salazar had gone and could reasonably have believed he was hidden in the car with Matz and other individuals from the porch.

In the face of this evidence, Matz insists that neither his proximity to Salazar on the porch nor his flight from officers, standing alone, would establish reasonable suspicion to support a *Terry* stop. Matz's assertion is correct as far as it goes. We have recognized that simply being in the presence of others who are themselves suspected of criminal activity is insufficient standing alone to establish particularized suspicion for a *Terry* stop and frisk. *See Ybarra v. Ill.*, 444 U.S. 85, 91 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, *without more*, give rise to probable cause to search that person.") (emphasis added). Likewise, we have acknowledged that suspicion of illegal activity at a particular location does not transfer such a suspicion to an individual leaving the property. *See United States v. Bohman*, 683 F.3d 861, 864 (7th Cir. 2012). Neither does the act of choosing to avoid a police encounter—either by refusing to cooperate or leaving the scene—by itself create

---

[2] Matz submitted a declaration in the district court in which he maintained that he "did not run from the porch area." But he has not disputed the accounts of both Klotka and Zuberbier that by the time they exited their vehicles all occupants of the porch had left and were moving quickly enough that it was necessary for the officers to give chase in order to speak with anyone from the porch.

sufficient objective justification for a seizure or detention. *See, e.g., Fl. v. Bostick*, 501 U.S. 429, 437 (1991).

But it is axiomatic that in determining whether officers had the requisite particularized suspicion for a *Terry* stop, we do not consider in isolation each variable of the equation that may add up to reasonable suspicion. *See*, *e.g.*, *United States v. Johnson*, 170 F.3d 708, 714 (1999) ("Applying the *Terry* standard, we have consistently held that reasonable suspicion is to be determined in light of the totality of the circumstances."). Instead, we consider the sum of all of the information known to officers at the time of the stop. *Terry*, 392 U.S. at 22-23; *United States v. Lenoir*, 318 F.3d 725, 729 (7th Cir. 2003). And this includes behavior that may in other circumstances be considered innocent; in other words, context matters. *Baskin*, 401 F.3d at 793 ("[B]ehavior which is susceptible to an innocent explanation when isolated from its context may still give rise to a reasonable suspicion when considered in light of all the factors at play."); *United States v. Fiasche,* 520 F.3d 694, 697-98 (7th Cir. 2008).

First, it is undisputed that the officers had particularized suspicion as to Salazar connecting him to armed robbery and multiple homicides. Given that Salazar and Matz were together on the porch, they also had a basis from which to conclude that Salazar may have fled in the same car as Matz and the other individual visible to them in the car. Although Salazar was not visible to the officers from their vantage point outside the car, he could have been hidden in the car to avoid detection and capture. In fact, it is unlikely that a person police believed to be wanted for armed robbery and possibly multiple homicides,

who had run from law enforcement, would remain in plain view as officers approached the car rather than hide in some way. Given that both Salazar and Matz were together on the porch and both exited the area simultaneously, the officers had an objectively reasonable basis to believe that Salazar could be in the vehicle with Matz, and therefore had an objectively reasonable basis to stop the vehicle and briefly detain the occupants while they ascertained whether Salazar was with him or whether they were complicit in helping him evade law enforcement. And it does not matter whether that was their actual motivation for stopping the vehicle, because the test under the Fourth Amendment is whether the seizure was objectively reasonable. *E.g.*, *Whren v. United States*, 517 U.S. 806, 813-14 (1996).

In sum, the officers possessed particularized and specific suspicion as to Salazar, a known gang member suspected of committing violent crimes. Their attempt to approach Salazar was met with the precipitous departure of the entire group, including Matz. In their justifiable attempt to apprehend Salazar, Klotka and Zuberbier gave chase to everyone scattering from the porch. They were outnumbered as they approached a moving vehicle that they reasonably could have believed contained Salazar, who was suspected of committing violent crimes and who could very well have been armed. Given these circumstances, it was reasonable for them to conduct further investigation, including stopping the vehicle leaving the scene and detaining the occupants so they could assess the situation. *See United States v. Howard*, 729 F.3d 655, 659 (7th Cir. 2013) (collecting cases and noting that the Supreme Court "has recognized limited situations at the scene of

police activity in which it may be reasonable for police to detain people not suspected of criminal activity themselves, so long as the additional intrusion on individual liberty is marginal and is outweighed by the governmental interest in conducting legitimate police activities safely and free from interference"); *cf. Wardlow*, 528 U.S. at 125 (recognizing that when officers confront behavior susceptible of two potential explanations, one innocent and one potentially criminal, they are entitled to "detain the individuals to resolve the ambiguity").

## B. Probable Cause for Arrest

So Officers Klotka and Zuberbier had (narrowly) enough reasonable suspicion to briefly detain Matz as they attempted to get the situation under control and ascertain where Salazar had gone. But Matz argues that what they actually did was more akin to a full-blown arrest than the limited detention permitted under *Terry*. And although eventually the officers learned that Matz was driving a stolen vehicle, he maintains that functionally, he was under arrest before the officers had probable cause. In assessing the reasonableness of an investigatory stop, we first consider whether the detention was justified from the outset and then ask "whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20; *see also Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013); *Jewett v. Anders*, 521 F.3d 818, 824 (7th Cir. 2008). A *Terry* stop may be transformed into a formal arrest requiring probable cause if an officer's use of force is sufficiently disproportionate to the purpose of the stop—which may include ensuring the safety of

the officers or others—in light of the surrounding circum-stances. *Rabin*, 725 F.3d at 632-33; *Jewett*, 521 F.3d 824-25. It may also become a de facto arrest if the detention continues longer than necessary to accomplish the purpose of the stop or becomes "unreasonably intrusive." *See United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011). The investigation following a *Terry* stop "'must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance so that it is a minimal intrusion on the individual's Fourth Amendment interests.'" *Id.* (quoting *United States v. Robinson*, 30 F.3d 774, 784 (7th Cir. 1994)).

Although the issue is again close, we conclude that given the circumstances it was reasonable for the officers to draw a weapon and even handcuff Matz while they controlled the situation and accounted for the individuals from the front porch. At the outset, we note that only a short period of time elapsed between when the officers first detained Matz and when they learned that he was driving a stolen vehicle. According to Matz, Zuberbier ran the VIN for the vehicle and discovered it was stolen sometime *before* the backup officers arrived at the scene. And although neither side has presented a specific time line, even a generous reading of the facts supports the conclusion that not much time could have elapsed between the time Matz was ordered out of the car and the moment Zuberbier (or another officer)[3] learned the car was

---

[3] Under the officers' version of events, Matz was placed in a police vehicle while they tracked down the other individuals from the porch and one of the backup officers who had arrived on the scene discovered that the car

(continued...)

stolen, thus providing probable cause for an arrest. This sequence of events makes it clear that police were diligently investigating to confirm or dispel their suspicions about the occupants of the vehicle. *See Rabin*, 725 F.3d at 634 (upholding detention of individual for approximately an hour and a half while officers verified legitimacy of his firearm license and noting that evidence suggested officers had diligently pursued likely avenue to resolve their suspicions); *United States v. Adamson*, 441 F.3d 513, 520 (7th Cir. 2006) ("There is no bright-line rule as to how long an investigative detention may last; instead we look to whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions."). So the *duration* of the stop is unproblematic given that officers diligently pursued information that, as it turned out, revealed in short order evidence that gave them probable cause for a full-blown arrest.

We are thus left with the question whether Matz has created a triable issue of fact as to whether the manner in which the officers effectuated the detention—pointing guns at Matz while ordering him to stop or risk having his "fucking head" blown off, frisking, handcuffing, and placing him in a patrol car—was reasonably related in scope to the circumstances which initially justified the interference. *Terry*, 392 U.S. at 20. The use of a firearm and handcuffs undoubtedly puts Matz's encounter at the outer edge of a permissible *Terry* stop.

---

[3] (...continued)
was stolen. The precise chronology is immaterial given our conclusion that under either version, officers were diligently pursuing information to resolve their suspicions.

As we have previously recognized, "'[s]ubtle, and perhaps tenuous distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a *de facto* arrest.'" *Bullock*, 632 F.3d at 1016 (internal quotations and citation omitted). These tenuous distinctions are at the heart of Matz's claim: he asserts that Zuberbier and Klotka made a de facto arrest without probable cause, and the officers argue, in essence, that a legitimate *Terry* stop evolved rapidly into an arrest supported by probable cause. The officers argue alternatively that qualified immunity protects them from liability because under the circumstances it would not have been clear to a reasonable officer that using force and handcuffs to detain Matz violated clearly established law. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (setting forth well-known qualified immunity test that government officials are protected from civil damages as long as conduct does not violate clearly established constitutional rights of which a reasonable person would have known); *Jones v. Clark*, 630 F.3d 677, 680 (7th Cir. 2011) (entitlement to qualified immunity turns on whether facts describe the violation of a clearly established constitutional right).

Although the hallmarks of formal arrest such as applying handcuffs, drawing weapons, and placing suspects in police vehicles should not be the norm during an investigatory detention, all of those measures have been recognized as appropriate in certain circumstances. *See Bullock*, 632 F.3d at 1016 (collecting cases); *Tilmon*, 19 F.3d at 1224-25 (noting "for better or for worse" the trend of expanding *Terry* stops to include "the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons, and other measures of force more traditionally associated with arrest

than with investigatory detention"); *United States v. Weaver*, 8 F.3d 1240, 1244 (7th Cir. 1993) (measured use of appropriate force does not convert seizure into arrest). In evaluating whether the force used converted an encounter into a full arrest, we must consider whether the surrounding circumstances would support an officer's legitimate fear for personal safety. *See Jewett*, 521 F.3d at 824. We must also take into account the suspect's own behavior in resisting an officer's efforts. *Id* at 825. (citing *United States v. Lawshea*, 461 F.3d 857, 860 (7th Cir. 2006)).

First, the officers were undoubtedly confronting a situation where they may have legitimately believed drawing weapons was necessary to protect themselves. They were pursuing an individual suspected of having committed armed robbery and possibly murder who was a member of the Latin Kings gang. Not only were they outnumbered, they were approaching a moving vehicle containing individuals who had been with Salazar just moments beforehand. Given the possibility that Salazar was hidden inside the vehicle, their clear disadvantage attempting on foot to stop a moving vehicle, and the possibility, given the nature of Salazar's suspected crimes, that individuals in the car may have been armed, it was not unreasonable to draw weapons to safely effect the stop.

These same reasons support the officers' decision to detain Matz with handcuffs, frisk him, and search the car to verify that Salazar was not inside. Matz and everyone else in the vicinity had already made it patently clear that they did not intend to remain where they were and speak to the police, and so Klotka and Zuberbier could reasonably have believed handcuffing the occupants of the car was the most safe and

efficient way to ascertain Salazar's whereabouts and any pertinent information about his suspected crimes. It was also a reasonable approach to deal with the rapidly evolving situation and prevent things from turning violent. *Cf. Brendlin v. Cal.*, 551 U.S. 249, 258 (2007) ("It is also reasonable for passengers to expect that an officer at the scene of a crime, arrest, or investigation will not let people move around in ways that could jeopardize his safety."). Klotka and Zuberbier called for backup almost immediately. With the benefit of hindsight we may be able to think of less intrusive ways–from a Fourth Amendment perspective—the officers could have detained Matz and the others. But the "fact that 'the protection of the public might, in the abstract, have been accomplished by 'less intrusive' means does not, by itself, render the search unreasonable.'" *Tilmon*, 19 F.3d at 1225 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973)); *see also United States v. Ocampo*, 890 F.2d 1363, 1369-70 (7th Cir. 1989) (stop not rendered unreasonable by fact that officer could have effectuated it without drawing his gun). Furthermore, we must "take care to consider whether the police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing." *United States v. Sharpe*, 470 U.S. 675, 686 (1985).

Although we conclude that the officers' safety and the dynamic situation they confronted justified using force and restricting Matz's movement, we again caution law enforcement officers that in the ordinary case a *Terry* stop should *not* be functionally indistinguishable from a full-blown arrest. Of particular cause for concern in this regard is Zuberbier's deposition testimony that he considers such detentions with

handcuffs as part of "normal" police work: "[W]e detain people all the time. We handcuff them, we find out it's all legitimate, talk to them, let them go. It's part of daily police work." On the contrary, we remind law enforcement that using handcuffs generally signifies an arrest, which requires probable cause and not the less demanding reasonable suspicion standard that permits only a brief and minimally intrusive detention. Indeed, the fact that we have recognized exceptions for concerns such as officer safety should not be read to imply that the use of handcuffs and more intrusive measures will not be a significant factor in assessing whether officers have exceeded the bounds of a limited *Terry* detention. *See Ramos v. City of Chicago*, 716 F.3d 1013, 1018 (7th Cir. 2013) ("The proliferation of cases in this court in which '*Terry*' stops involve handcuffs and ever-increasing wait times in police vehicles is disturbing, and we would caution law enforcement officers that the acceptability of handcuffs in some cases does not signal that the restraint is not a significant consideration in determining the nature of the stop."); *see also Rabin*, 725 F.3d at 639-41 (concurring opinion) (detailing exceptions supporting use of handcuffs and other formal hallmarks of arrest and reiterating that such invasive measures should be exception not rule).

## C. Probable Cause Determination

Matz next claims that after his arrest, he never received the constitutionally required prompt determination of probable cause. It is well-established that "the Fourth Amendment requires a timely judicial determination of probable cause as a prerequisite for detention." *Gerstein v. Pugh*, 420 U.S. 103, 126

(1975). Probable cause determinations made within 48 hours of arrest are presumptively prompt. *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991). Beyond the requirement of a "prompt" determination, states retain wide latitude to craft procedures for probable cause determinations that "accord with a State's pretrial procedure viewed as a whole," and the Supreme Court has expressly recognized "the desirability of flexibility and experimentation by the States." *Gerstein*, 420 U.S. at 123. Matz argues principally that "Milwaukee County's practice of allowing court commissioners to make probable cause determinations based on arrest and detention reports" is inconsistent with *Riverside*'s requirement of a prompt determination of probable cause.

Matz's claim cannot succeed insofar as it is leveled against Milwaukee County or the "court commissioner" (who the parties fail to describe beyond referring to her as "Commissioner Liska").[4] A damages suit under § 1983 requires that a defendant be personally involved in the alleged constitutional deprivation. *See Minix v. Canarecci*, 597 F.3d 824, 833 (7th Cir. 2010) ("[I]ndividual liability under § 1983 requires 'personal involvement in the alleged constitutional deprivation'") (quoting *Palmer v. Marion Cty*, 327 F.3d 588, 594 (7th Cir. 2003)). As the quoted language above makes clear, Matz's claim hinges on Milwaukee County's "practice," allegedly followed in his case, of allowing unsworn statements in an arrest report

---

[4] Neither party provides any more detail about the "court commissioner" and nowhere does Matz argue expressly that the court commissioner fails to satisfy the requirement of a "judicial determination" of probable cause, so we do not explore the issue further.

presented to a county commissioner to supply the necessary probable cause for arrest. And as troubling as this practice may be, Matz has presented no evidence that any defendants named here had anything to do with it.

Indeed, the entire thrust of his argument on this point has shifted on appeal. In the district court, Matz argued that genuine issues of material fact existed as to whether he received a timely probable cause determination. Specifically, Matz claimed that Captain Moffet's affidavit accompanying the "probable cause determination" report signed by Commissioner Liska failed to establish that Moffet was qualified to verify that the report was kept during the regular course of business, and so the report was inadmissable hearsay as to the question of whether Matz receive a probable cause determination. The district court rejected this argument, and Matz does not renew it on appeal. Instead, as discussed above, he attacks the practice of allowing unsworn statements and the unsworn statements themselves. But as the defendants point out, the report was not authored, signed, nor otherwise created by any of the named defendants.

The report states that it was written by an officer Richard Wearing, who was assigned to the warrant squad. He describes the encounter Zuberbier and Klotka had with Matz that culminated in the revelation that he was driving a stolen vehicle. There is then another paragraph written by Detective Gary Temp, who recounts that Omar Rodriquez was shot and killed five days prior to Matz's arrest, Victoriano Mariano was shot and killed four days before Matz's arrest, and that two other individuals were shot and sustained injuries four days before Matz's arrest. The report then states that after being

advised of and waiving his *Miranda* rights, Matz admitted to shooting all four individuals. The report bears the seal of a notary (David B. Zibolski), who signed to verify that it was subscribed and sworn before him on September 18, 2003. Finally, a box bearing the heading "Probable Cause Determination," contains a signature the parties agree to be that of Commissioner Liska. It is clear that at least the second portion of the report, written by Detective Temp, was sworn before a notary. But Matz claims that we cannot consider this section because it is based on his confession allegedly procured in violation of the Fifth Amendment, and the portion written by Wearing is also off limits because it is unsworn.

Citing our decision in *Haywood v. City of Chicago*, 378 F.3d 714 (7th Cir. 2004), Matz now advances the argument that any probable cause determination is constitutionally inadequate because the report contains unsworn statements—specifically, the portion written by Richard Wearing that recounts Matz's arrest.[5] *Haywood* does little for Matz, however, because in that § 1983 suit the plaintiff sued the City of Chicago and two arresting officers, one of whom forged the other's name on the complaint presented to secure probable cause to hold the plaintiff. The problem in *Haywood* was that although the complaint purported to satisfy the Fourth Amendment's

---

[5]  Both parties agree that Officer Wearing provides a confusing description of the events leading to Matz's arrest. This is because Wearing refers interchangeably to Salazar and Matz as the "subject," and fails to identify Matz by name, thus leaving it unclear whether Zuberbier and Klotka arrested Salazar or Matz after stopping the vehicle. But it is ultimately of no consequence because Matz is not suing Officer Wearing for writing an inadequate report about the encounter.

requirement that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation," the only basis the defense advanced for finding probable cause "was a falsely sworn complaint whose falsity was, so far as appears, unknown to the judge at the probable-cause hearing." *Id.* at 718. Here there is no allegation that Officer Wearing or Detective Temp falsely signed the report or that the report contained false information. Matz believes that because the notarized seal is closest to the portion of the report authored by Temp, Officer Wearing's contribution is necessarily unsworn and therefore inadequate under the Fourth Amendment to establish probable cause. *Haywood* is obviously and immediately distinguishable based on the fact that both the City and the individuals who authored and (falsely) claimed to have authored the report were sued. Matz has not sued Gary Temp, Richard Wearing, or Milwaukee County, who he claims has a "practice" of allowing unsworn statements to suffice for probable cause determinations. Indeed, as it is not a defendant, we have no way of knowing what Milwaukee County's "practice" is and whether it was followed here. In any event, what is clear is that Matz has presented no evidence that Matz, Klotka, Jones, Caballero, Walton, or Moore had any hand in crafting the report or presenting it to the court commissioner for a probable cause determination.

Matz deems it "irrelevant" whether the defendants were personally involved in authoring the arrest report. But in a § 1983 claim for damages, the sole issue cannot be, as he would have it "whether the district court correctly found that the arrest report established, as a matter of law" that Matz received an adequate and timely probable cause determination.

That question itself is irrelevant if none of these defendants were personally involved in the alleged deprivation. It is thus hardly irrelevant whether *these defendants* participated in submitting the arrest report to the commissioner in lieu of providing him with an in-person probable cause determination (a process that did not occur until September 23, 2003, seven days after Matz's arrest and well outside *Riverside's* 48-hour window). He belatedly argues in his reply brief that Klotka and Zuberbier provided some information in the report and Walton, Caballero, Jones, and Moore were involved in obtaining the allegedly coerced statement recounted by Detective Temp—and that the named defendants were therefore "involved" in the deprivation. But according to Matz, it is the practice of using unsworn statements, and the use of an allegedly coerced confession that make the document submitted to Commissioner Liska deficient. And he has presented no evidence that these defendants either knew about that practice or participated in the decision to include Matz's allegedly coerced confession in the report. Thus, they are entitled to summary judgment on Matz's Fourth Amendment *Riverside* claim. *See Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1039 (2003) ("'Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation.'")(quoting *Vance v. Peters*, 97 F.3d 987, 991 (7th Cir. 1996)).

### D. Fifth Amendment Claim

That leaves Matz's claim that several of the defendants violated his Fifth Amendment rights by continuing to interrogate him after he invoked his right to remain silent. It is undisputed that Matz did not make any incriminating statements during either his interview in the patrol van with Detective Caballero or the next day when Jones and Moore interviewed him at the police station. The Fifth Amendment "privilege against self-incrimination, and thus the *Miranda* doctrine, concerns the use of compelled statements in criminal prosecutions." *Hanson v. Dane Cnty., Wis.*, 608 F.3d 335, 339 (7th Cir. 2010). No rational juror could conclude that the first two interrogations violated Matz's Fifth Amendment rights—he said nothing incriminating at all, and so there was obviously no statement used against him in his criminal proceeding. *See id.* ("Police cannot 'violate *Miranda*,' despite colloquial usage. … There's nothing wrong with compelling people to speak."). Matz, however, claims that he may still be entitled to monetary damages against Moore and Jones because their initial interrogations were part of the "causal chain" that resulted in his later involuntary confession to Caballero and Walton.

But whether treated as a continuous interrogation that produced an inculpatory statement or separated into three distinct interviews, we agree with the district court that Matz's Fifth Amendment claim for damages is barred under *Heck v. Humphrey*, 512 U.S. 477 (1994). Under *Heck*, a plaintiff may not recover damages under § 1983 when a judgment in his favor would necessarily imply the invalidity of a criminal conviction

or sentence that has not been reversed, expunged, invalidated, or otherwise called into question. *See id.* at 486-87; *Helman v. Duhaime*, 742 F.3d 760, 762 (7th Cir. 2014). There is no question that Matz's conviction and sentence have neither been invalidated nor called into question[6]. The only question is thus whether Matz's conviction or sentence necessarily depended on his allegedly coerced confession.

We conclude, like the district court, that success on Matz's Fifth Amendment claim would necessarily imply the invalidity of Matz's sentence. At sentencing, the judge relied heavily on Matz's confession as well as his subsequent decision to recant his admissions. Specifically, Matz explained to the judge that he confessed out of loyalty to his fellow Latin King codefendants in the hopes that he could take the fall and the rest of them "would be able to go home." The sentencing judge rejected the notion that Matz confessed because "it was the right thing to do," and opined instead that Matz thought he could be out in "five — ten years" and emerge in his "rightful spot" as the leader of the Latin Kings brotherhood because he had stepped up and taken responsibility for the "weaklings" beneath him. The judge believed that when the reality of the prison sentence Matz was facing set in and it came to light that his fellow Latin Kings had inculpated him in the crime, he was scared and realized that it was not worth taking the fall for his confederates. The court accordingly concluded that Matz had only a

---

[6] Matz's conviction was affirmed on direct appeal and the Wisconsin Supreme Court denied his petition for review; he has also unsuccessfully petitioned under 28 U.S.C. § 2254 to vacate, set aside, or correct his sentence.

"sort of a selfish, self-centered remorse" and thus posed a high risk of reoffending. Matz's confession and the sentencing judge's assessment of the reasons behind it thus figured prominently in the court's decision to sentence Matz consecutively on the two counts of conviction. Because that sentence remains intact, Matz cannot pursue a § 1983 claim for damages premised on his allegedly coerced confession because success on his claim would call into question his sentence. *Heck* thus bars Matz's Fifth Amendment claim. *See Davis v. Kan. Dep't of Corr.*, 507 F.3d 1246, 1249 (10th Cir. 2007) (barring claim challenging sentencing calculation); *cf. Muhammad v. Close*, 540 U.S. 749, 751 (2004) (per curiam) (summarizing *Heck* bar as applicable to any § 1983 damages action that "would implicitly question the validity of conviction *or duration of sentence*" that has not been previously invalidated) (emphasis added).

### III.

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment in favor of the defendants.